[9 NYS3d 277]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v PRINCE CLARK, Appellant.

Second Department, April 29, 2015

### APPEARANCES OF COUNSEL

*Lynn W.L. Fahey*, New York City (*De Nice Powell* of counsel), for appellant.

*Kenneth P. Thompson*, *District Attorney*, Brooklyn (*Leonard Joblove* and *Sholom J. Twersky* of counsel), for respondent.

### OPINION OF THE COURT

MASTRO, J.P.

The defendant stands convicted of murder in the second degree for the shooting death of Jamel Wisdom, and assault in the second degree for the shooting of Gamard Talleyrand, who survived his injuries. At trial the defendant relied on a mis-

identification defense, maintaining throughout the proceedings that he was not the individual depicted fighting with Wisdom on a grainy surveillance video that captured the shooting, and emphasizing Talleyrand's inability to identify his assailant. On appeal the defendant primarily argues that he was denied his constitutional right to the effective assistance of counsel by his trial counsel's failure to request that the court charge the jury on the potential alternative defense of justification, and that the trial court erred by failing to charge such a justification defense sua sponte. For the reasons that follow, we reject the defendant's contentions. Trial counsel's failure to request that the court charge a justification defense, which defense was contrary to his client's claim of actual innocence and against his client's informed choice and expressed wishes in selecting a defense, and which would have served to undermine his competing misidentification defense, did not render trial counsel's representation constitutionally deficient. Furthermore, the trial court was not required to give a justification charge over the objections of the defendant and his counsel, and in contravention of the defendant's personal and fundamental right to maintain his innocence and to present a defense of his own choosing.

The evidence at the defendant's trial established that, at approximately 10:00 p.m. on September 22, 2008, the defendant and his cousin, Michael Morrison, were with their girlfriends and another friend (hereinafter the eyewitness) on East 17th Street in Brooklyn. According to the testimony of the eyewitness, at that time, a group of four or five other men, including Talleyrand and Wisdom, confronted the defendant and began to taunt, push, and fight with him. Talleyrand was "beating [the defendant] up," although the fight consisted of "tussling. They was all like pushing him and trying to . . . act like tough guys and [the defendant], he didn't really want to fight. They just provoked him and provoked him and he fought." The eyewitness elaborated that "[the defendant] was fighting [Talleyrand] and they was all like pushing him and, like . . . oh, you're a pussy and trying to punk him." The members of the group laughed at the defendant, who became "upset because they beat him up." During the intermittent fighting, the eyewitness saw the defendant's eye bleed, and she heard him say, "They got a knife, they are going to cut me." However, the eyewitness did not specify which person allegedly had a knife, and neither the eyewitness nor any other witness ever testified to seeing any member of the group in possession of a knife. In

fact, no evidence regarding the existence of a knife was ever mentioned again at the trial.

Once the fighting ceased, the defendant retreated to East 19th Street, but again he was accosted by his tormentors before he reached an apartment building at 68 East 19th Street, where he and Morrison lived on the fifth floor with relatives. Members of the group continued "provoking" him and were "beating him up again and they pushed him in the trash." The defendant entered the building with Morrison, and the two returned to the street shortly thereafter, the defendant visibly angry and upset. The defendant walked down the block at a fast pace in the direction of the group who had been fighting with him. The eyewitness, who had accompanied the defendant to East 19th Street, did not see him do anything, but she heard gunshots and fled the scene.

Talleyrand, the defendant's neighbor, testified that he had known the defendant for one to two years and had considered him a friend until they had a disagreement over the ownership of some jewelry. Talleyrand admitted to fighting with the defendant on the night in question. The fight ended in the vicinity of the defendant's building, and Talleyrand did not notice where the defendant went afterwards. However, shortly after the fight ended, Talleyrand was standing in the street near some other people when he observed Wisdom drop to the ground. Talleyrand turned around and saw the barrel of a gun, so he began running. As he ran, a bullet struck him in the calf. He did not see, and could not identify, who was holding the gun. Talleyrand was treated at the hospital and eventually recovered from his wound.

Video recordings from surveillance cameras located in the interior and on the exterior of the defendant's apartment building were admitted into evidence and played for the jury. The eyewitness identified the defendant as a male wearing a white T-shirt in the video. However, Talleyrand viewed the same footage and was unable to make any identification. The video revealed that the male in the white T-shirt and another male (identified by the eyewitness as Michael Morrison) entered the building lobby at approximately 10:26 p.m. (a time which coincided with the end of the fistfight in the street). The male in the white T-shirt used the elevator and the other male ascended a set of stairs. They then came down the stairs together a mere one minute later and hurriedly exited the building. The male in the white T-shirt walked into the street

and appeared to shout and gesture at others, while his companion waited several feet from the lobby entrance. Approximately two minutes later, the male in the white T-shirt returned to his companion and, appearing agitated, retrieved a handgun from him. He then walked back into the street and out of the camera's view. Approximately 20 seconds later, as confirmed by other evidence, Talleyrand was shot in the leg, and the crowd of bystanders hurriedly scattered in all directions. An additional 15 seconds later, the male in the white T-shirt, still holding the gun, reappeared on the video, quickly backing up toward the entrance to the building lobby as another man, subsequently identified as Wisdom, pursued him inside. Wisdom did not brandish any weapon. The two men entered the lobby and briefly wrestled. The male in the white T-shirt then wriggled free and fired several shots into Wisdom at close range. The two men fell to the ground together, and a third male appeared on the scene and separated them. The male in the white T-shirt then ran away, while the body of Wisdom, shot six times at close range, lay still on the floor of the lobby. Wisdom died from his wounds.

During the trial, the defendant's assigned counsel advised the court on the record that he had discussed with the defendant the possibility of presenting defenses of extreme emotional disturbance and/or justification in addition to the misidentification defense favored by the defendant, but stated, "I would need the defendant's permission to make such an argument." Counsel summarized the defendant's position thusly: "[H]e said no way. I do not wish to have you indicate in any manner, shape or form as far as justification or diminished capacity on the murder two. Without his permission I've told him I cannot do it. The answer was no way."

In order to assure itself that the defendant, who was 21 years old at the time of the trial, understood the ramifications of his decision, the trial court engaged in a lengthy colloquy with him. As the transcript of that exchange reveals, the defendant, far from being an innocent waif who was unfamiliar with the relevant legal concepts and their potential consequences, demonstrated savvy and sophistication in his choice of defense:

> "THE COURT: All right, Mr. Clark, you understand what counsel is saying? . . . I mean the most common defense obviously [is] you got the wrong guy, it wasn't me. Other times in a homicide case based on the circumstances the defendant may raise the

claim, well, I did it but I thought he was going to kill me so it was self defense. Or third in some cases that whatever the circumstances were, even though I did it[,] I did it under an extreme emotional disturbance and, therefore, the law says that if established [it] might reduce a murder charge to a manslaughter charge, do you understand what I'm saying?

"THE DEFENDANT: I understand. I comprehend, Judge.

"THE COURT: Have you had an adequate opportunity to discuss these various legal issues and tactical decisions with your attorney?

"THE DEFENDANT: Yes.

"THE COURT: And we've indicated now in open court that at least [as] to the justification or self defense claim or the extreme emotional disturbance, . . . [h]ave you had a chance to discuss that?

"THE DEFENDANT: I did.

"THE COURT: And your attorney says that as a tactical decision which you're entitled to make, that you don't want to pursue those defenses in terms of justification and or extreme emotional disturbance, is that correct?

"THE DEFENDANT: That is correct.

"THE COURT: Anybody force you or threaten you in any way to make that decision?

"THE DEFENDANT: No.

"THE COURT: Anybody make any promises to you to get you to make that decision?

"THE DEFENDANT: No, sir.

"THE COURT: You doing so voluntarily in full recognition of the potential consequences?

"THE DEFENDANT: I am not making any decision . . . referring *to you reducing it to any* manslaughter or anything like that *cause this is not me.*

"THE COURT: Okay. All right" (emphasis added).

In accordance with the defendant's foregoing acknowledgment that he had fully discussed potential alternative defenses, including justification, with his counsel; his emphatic insistence on pursuing only a misidentification defense because he was not the person depicted in the video recordings; and his unequivocal statement that he did not want to compromise his misidentification defense by submitting alternative defense theories that were necessarily premised on him being the shooter, defense counsel actively pursued the misidentification defense. Indeed, during the trial, counsel advised the court that he was investigating information that Khalid Wisdom, brother of Jamel Wisdom, the homicide victim, had been present on the night of the incident and might be willing to testify that someone other than the defendant had killed Jamel Wisdom. With the court's assistance, counsel subsequently interviewed Khalid Wisdom, but ultimately determined that he did not wish to call him as a defense witness.

During summations, defense counsel emphasized the weakness of the identification evidence submitted by the prosecution, attacking the quality of the surveillance video recordings and arguing that it was impossible to make a definitive identification from them. He further questioned the ability of the eyewitness to make such an identification from the video, positing that her identification was attributable to the suggestive influence of the prosecution rather than her actual recognition of the shooter depicted in the indistinct video image. Counsel reinforced this theme by noting that shooting victim Talleyrand, who was very familiar with the defendant, was completely unable to make any identification from the video or from the circumstances of his own shooting. Counsel additionally pointed out the lack of any forensic evidence that clearly linked the defendant to the commission of the crimes, and suggested that the defendant's cousin, Michael Morrison, may even have been the shooter.

During deliberations, the jury sent out a series of notes, one of which asked, "[W]ith respect to Mr. Wisdom if he initiated the struggle [and the defendant] was acting defensively does that negate intent to kill[?]" When the court solicited comments from counsel regarding the note, defense counsel, consistent with the defendant's voluntary and informed defense decision, stated, "[A]s far as the murder is concerned the [c]ourt is aware that I have been instructed to use only one defense . . . that the defendant is not the one in the tapes." With regard

to fashioning an appropriate response to the note, defense counsel further suggested, in keeping with his client's wishes, that the court should focus on the proof of the elements of murder in the second degree, especially intent to kill, but noted, "I object to any reference to self defense or you advising the jury that that issue was not before them and they're not to rule on it." Conversely, the prosecutor observed that justification had not been an issue in the case, and that "the People never had an opportunity to even deal with or address [that defense]." Therefore, the prosecutor advocated that, out of fairness, the jury be instructed not to consider justification. The court responded to the note by giving the jury a lengthy charge on intent, and thereafter provided the following instruction:

> "Now under the law there is a concept in the law called justification, self defense. It requires a number of factors to be present. *You were not instructed on what's commonly called the law of self defense*. What you were instructed on is the issue of intent . . . That is the—what you have to focus on; whether or not the defendant intended to cause the death of Mr. Wisdom in that causing his death was his conscious objective or purpose" (emphasis added).

Following several more notes addressing a variety of issues, and an additional day of deliberations, the jury returned a verdict finding the defendant guilty of intentional murder in the second degree and assault in the second degree. This appeal by the defendant ensued. Since the jurors apparently determined that the man wearing the white T-shirt in the surveillance video recordings was in fact the defendant, we will refer to him as such hereinafter.

On appeal, the defendant contends that the prosecution failed to present legally sufficient evidence that he intended to kill Wisdom, or alternatively, that the verdict in this regard was contrary to the weight of the evidence. He further asserts that he was denied the effective assistance of trial counsel based on his attorney's failure to object to the trial court's exclusion of the public audience from the courtroom during voir dire proceedings. Additionally, he maintains that his trial counsel was ineffective in failing to present a justification defense and to request a justification charge, notwithstanding the defendant's own express wishes and explicit instructions to the contrary. Furthermore, he claims that the trial court erred

in failing to instruct the jury, sua sponte, and over his objection, with respect to the justification defense in response to the aforementioned jury note, and that the court improperly enhanced his sentence based on his silence during the sentencing proceedings. As discussed below, several of these contentions are unpreserved for appellate review, and all are without merit.

## I. Sufficiency/Weight of the Evidence

The defendant's contention that the evidence was legally insufficient to support his conviction of murder in the second degree because the prosecution failed to prove the element of intent to kill is unpreserved for appellate review (*see* CPL 470.05 [2]; *People v Hawkins*, 11 NY3d 484, 491-492 [2008]; *People v Brummel*, 103 AD3d 805 [2013]; *People v Hollman*, 98 AD3d 584, 585 [2012]; *People v Arias*, 64 AD3d 786, 787 [2009]). In any event, viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620, 621 [1983]), we find that it was legally sufficient to establish the defendant's guilt of that crime beyond a reasonable doubt (*see People v Sanducci*, 195 NY 361, 367-368 [1909]; *People v Brummel*, 103 AD3d 805 [2013]; *People v Norris*, 98 AD3d 586 [2012]; *People v Hollman*, 98 AD3d at 585; *People v Martinez*, 144 AD2d 699, 701 [1988]; *People v Milea*, 112 AD2d 1011, 1013 [1985]). Additionally, in fulfilling our responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]; *People v Danielson*, 9 NY3d 342 [2007]), we nevertheless accord great deference to the jury's opportunity to view the witnesses, hear the testimony, and observe demeanor (*see People v Mateo*, 2 NY3d 383 [2004]; *People v Bleakley*, 69 NY2d 490, 495 [1987]). Upon reviewing the record here, we are satisfied that the verdict of guilt was not against the weight of the evidence (*see People v Romero*, 7 NY3d 633 [2006]).

## II. Ineffective Assistance of Counsel

Contrary to the defendant's contention, he was not deprived of the effective assistance of counsel by reason of his trial counsel's failure to object to the exclusion of the defendant's family members from the courtroom during voir dire. The record reveals that the courtroom was emptied of audience members in order to accommodate the seating of prospective jurors. At the time of the courtroom closure in this case, defense counsel had a reasonable basis for believing that the court's

conduct in clearing the courtroom was unobjectionable under the prevailing law in this Judicial Department (*see People v Martin*, 71 AD3d 917 [2010], *revd* 16 NY3d 607 [2011]). Although the Court of Appeals subsequently made clear that such closure constitutes error (*see People v Martin*, 16 NY3d 607 [2011]), "an attorney is not ineffective for failing to anticipate a change in the law" (*People v Lewis*, 102 AD3d 505, 506 [2013], *affd* 23 NY3d 179 [2014]; *see People v Abner*, 101 AD3d 1628, 1629 [2012]; *People v Sanchez*, 76 AD3d 122, 130 [2010]; *People v Brisson*, 68 AD3d 1544, 1547 [2009]).

The defendant further contends that his trial counsel was ineffective in acceding to the defendant's wish to pursue only a misidentification defense and to forgo what he perceives to have been a potentially stronger justification defense based on the struggle between Wisdom and the man the jury ultimately found to be the defendant, which struggle was depicted in the video recorded by the surveillance camera in the apartment building lobby. This contention is unpersuasive.

To be sure, when a defendant accepts the assistance of counsel, he or she retains authority only over certain fundamental decisions, such as whether to plead guilty, whether to waive a jury trial, whether to testify at trial, and whether to take an appeal (*see People v Davis*, 13 NY3d 17, 30 [2009]; *People v Colon*, 90 NY2d 824, 825-826 [1997]). Matters of strategy and tactics, such as whether to request the submission of lesser-included offenses for the jury's consideration (*see People v Colville*, 20 NY3d 20 [2012]; *People v Brown*, 117 AD3d 1536 [2014]), whether to seek or consent to a mistrial (*see People v Ferguson*, 67 NY2d 383 [1986]), or whether to introduce certain evidence at trial (*see People v Lee*, 120 AD3d 1137 [2014]), generally fall within the purview of counsel. However, and of particular significance in the present case, the Court of Appeals has made clear that "a defendant unquestionably has the right to chart his own defense" (*People v DeGina*, 72 NY2d 768, 776 [1988]). Contrary to the defendant's current position, his decision to pursue a defense based solely on misidentification, and to affirmatively reject an alternate defense based on justification in steadfast furtherance of that misidentification defense, involved a matter that was "personal" and "fundamental" to him (*see People v Colville*, 20 NY3d at 31), and "did not implicate a matter of trial strategy or tactics" (*People v Petrovich*, 87 NY2d 961, 963 [1996]). Indeed, under our law there simply is no more personal and fundamental right than that of the accused to

rise before the trial justice and proclaim—to the court and to the world—his or her complete factual innocence of the crimes with which he or she has been charged. To require defense counsel in this case, over his client's objection, to undermine that assertion of innocence by the injection into the case of a factually and logically inconsistent defense would, under the circumstances presented, impermissibly compromise that personal right.

The decision in *People v Petrovich* (87 NY2d 961 [1996]) is instructive in this regard. There, the defendant, who was accused of murdering his parents, presented what is commonly referred to as an "insanity" defense. During a charge conference, the trial court inquired as to whether the defendant also wanted an instruction on the affirmative defense of extreme emotional disturbance which, if successful, would reduce the murder counts to manslaughter in the first degree. Defense counsel responded affirmatively to the court's offer. However, on the following day, the defendant himself disagreed, advising the court that he did not want the extreme emotional disturbance defense presented to the jury, fearing that it would undermine his ability to secure a verdict of not guilty by reason of insanity. Defense counsel insisted that he, not the defendant, should decide what instructions to request. The trial court, after ascertaining that the defendant's decision was knowing and voluntary, declined to charge the extreme emotional disturbance defense, over defense counsel's strenuous objections. The defendant was convicted of two counts of second-degree murder and appealed, arguing that the trial court should have acted in accordance with his counsel's wishes. The Court of Appeals rejected the argument, holding that "[a]s between defendant and his counsel, the decision whether to request submission of the affirmative defense of extreme emotional disturbance to the jury falls to defendant" (*id.* at 963). The Court of Appeals thereby determined that since the charging of the extreme emotional disturbance defense could lessen the defendant's prospects of obtaining a complete acquittal on his insanity defense, the decision of whether to take that risk was reserved to the defendant.

Similarly, the defendant in this matter steadfastly maintained at trial that he was factually innocent of the charged offenses—that he in fact had been misidentified in the surveillance video recordings. This is hardly surprising. Misidentification is arguably the most commonly-employed defense

asserted by criminal defendants, and scientific studies have documented numerous factors that can undermine the reliability of an identification (*see generally People v LeGrand*, 8 NY3d 449 [2007]). Thus, where the prosecution's proof consists of an identification by a single witness, the evidence must be closely scrutinized, and courts have even permitted expert testimony regarding those circumstances that can influence the accuracy of an identification (*see People v LeGrand*, 8 NY3d 449 [2007]; *People v Nazario*, 100 AD3d 783 [2012]).

It is also clear from the present record that the defendant and his counsel appreciated that requesting the submission of the defense of justification, a defense logically at odds with the misidentification defense, could well reduce the defendant's chances of acquittal by rendering his position less credible in the eyes of the jury. Indeed, a charge which informs the jury that the defendant claims he did not shoot the decedent and, further, that if he is found to have done so, he acted in self-defense may well undermine the credibility and dilute the strength of both defenses. Of course, a justification charge also would not even have applied to the assault count. In this regard, there is no evidence in the record that the defendant was confronted with any threat of the use of force against his person at any point between the time he exited the apartment building with Morrison and his shooting of Talleyrand. Accordingly, there simply was no reasonable view of the evidence which could have supported the submission of a justification defense with respect to the charge of assault in the second degree, and that defense could not have resulted in the complete acquittal that was so clearly the defendant's ultimate goal in selecting the defense of misidentification. In similar circumstances, courts repeatedly have held that counsel is not ineffective where he or she adheres to his or her client's chosen defense and declines the submission of additional defenses which, while potentially applicable to the facts of the case, are logically inconsistent with that chosen defense (*see e.g. People v Cruz*, 88 AD3d 540 [2011] [counsel was not ineffective in respecting his client's desire to pursue an all-or-nothing defense of complete innocence and declining to pursue any defense that might lead to a conviction of a lesser offense]; *People v Thomas*, 299 AD2d 942 [2002] [counsel not ineffective in failing to pursue a justification defense where the proffered defense was mistaken identification]; *People v Myers*, 283 AD2d 258 [2001] [counsel did not err in failing to present a justification defense

that would be substantially inconsistent with the proffered accident defense]).

The defendant's attempt to distinguish *People v Petrovich* (87 NY2d 961 [1996]) by contending that its holding is limited only to the defense of extreme emotional disturbance, or only to affirmative defenses in general (as opposed to the ordinary defense of justification, which must be disproved by the prosecution), is without merit. It is clear that the prejudice caused by the submission of an additional, factually inconsistent defense—i.e., the undermining of both defenses and the loss of a potential complete acquittal—is the same, regardless of whether the additional defense is affirmative or ordinary. Accordingly, this consideration presents a sound basis for leaving the choice of defense, whether affirmative or ordinary, with the defendant rather than his or her attorney.

Likewise, the defendant's claim that his counsel was ineffective for pursuing a weak misidentification defense instead of an appreciably stronger justification defense does not withstand scrutiny. Initially, as we have already noted, since the defendant had the right to chart his own defense, and since he made a voluntary, knowing, and intelligent election to pursue a viable misidentification defense and to eschew reliance upon a justification argument, it was not the role of his counsel to override his wishes by championing an inconsistent defense. However, even if we were to agree with the defendant's current position that the decision in *People v Colville* (20 NY3d 20 [2012]), which grants defense counsel the final say regarding which lesser-included offenses to request, also gives counsel ultimate authority over which defenses to present, *Colville*'s pronouncement of such a new rule came almost two years after the conclusion of the defendant's trial. Again, since counsel cannot be found ineffective for failing to anticipate changes in the law (*see People v Lewis*, 102 AD3d at 506; *People v Abner*, 101 AD3d at 1629), the defendant's ineffective assistance argument must further fail in this regard.

Moreover, even if it could be said that defense counsel in this case erred in acceding to his client's wishes based on a mistaken subjective belief that he was obligated to follow his client's orders, the fact remains that "in ineffective assistance cases, counsel's *subjective* reasons for a decision are immaterial, so long as '[v]iewed *objectively*, the transcript and the submissions reveal the existence of a trial strategy that might well have been pursued by a reasonably competent attorney' "

(*People v Evans,* 16 NY3d 571, 575 [2011], quoting *People v Satterfield,* 66 NY2d 796, 799 [1985]). Contrary to the defendant's present contention, the misidentification defense chosen by him, while perhaps not compelling, was at least as strong as the justification defense he now espouses on this appeal, and in fact appears to have been far more legally viable, such that trial counsel cannot be faulted for favoring a misidentification defense over a justification defense. There was no direct evidence that the defendant shot Talleyrand, nor was there any forensic evidence definitively linking him to the shooting of either Talleyrand or Wisdom. Moreover, while the prosecution did produce a lone witness, the eyewitness, who testified that the indistinct image of the shooter depicted in the surveillance video recordings was the defendant, the defendant's former friend and longtime acquaintance, Talleyrand, was unable to identify the shooter from the same video. Furthermore, while the video images of the male identified as the defendant by the eyewitness admittedly lacked clarity, it is significant that the images failed to reveal any evidence of injuries to that male, despite the eyewitness's testimony that the defendant was beaten repeatedly and was bleeding from his eye. Thus, there certainly was more than a colorable claim of misidentification in this case, and it is small wonder that the defendant maintained "this is not me" when referring to the shooter depicted in the surveillance video recordings.

Conversely, the purported justification defense and charge were much less attractive. First, as previously noted, justification would provide no defense whatsoever to the assault charge based on the shooting of Talleyrand, and therefore it could not possibly result in the acquittal of all charges that was the defendant's ultimate goal. Second, the defense was tenuous at best. The evidence supporting it, viewed most favorably to the defendant, demonstrated that the defendant safely retreated to his residence once the fighting in the street ceased, but instead of remaining there and calling the police, he and Morrison hurriedly retrieved a gun from the premises and rejoined the conflict only one minute later. By his conduct, the defendant escalated the situation and assumed the role of the aggressor. These circumstances, coupled with an appropriate charge on justification principles, would not have augured well for the defense (*see generally People v Collice,* 41 NY2d 906 [1977]). Third, as noted earlier, the submission of a justification defense would logically conflict with the tenable misidentification

defense, rendering it more likely that the jury would reject both. "While a defendant is not forbidden to [present contradictory defenses], it is plainly a hazardous tactic, for it not only risks confusing the jury as to the nature of the defense but also may well taint a defendant's credibility in the eyes of the jury" (*People v DeGina*, 72 NY2d at 777 [citation omitted]).

"The right to effective assistance of counsel is guaranteed by the Federal and State Constitutions[,] [but a] contention of ineffective assistance of trial counsel requires proof of less than meaningful representation, rather than simple disagreement with strategies and tactics" (*People v Rivera*, 71 NY2d 705, 708-709 [1988]). "As long as the defense reflects a reasonable and legitimate strategy under the circumstances and evidence presented, even if unsuccessful, it will not fall to the level of ineffective assistance" (*People v Benevento*, 91 NY2d 708, 712-713 [1998]). Therefore, "[w]here the evidence, the law and the circumstances of a particular case, viewed together and as of the time of representation, reveal that meaningful representation was provided, defendant's constitutional right to the effective assistance of counsel has been satisfied" (*People v Satterfield*, 66 NY2d at 798-799; *see People v Baldi*, 54 NY2d 137, 147 [1981]).

Applying the foregoing principles to the facts of this case, the trial record amply supports the conclusion that defense counsel did not, as the defendant suggests, permit the defendant to dictate the imposition of an incredible defense theory at the expense of a legitimate one. Rather, the evidence, viewed objectively, demonstrates that the misidentification defense had far greater evidentiary support than the purported justification defense, and that it constituted a strategy that might well have been pursued by a reasonably competent attorney (*see e.g. People v Moore*, 66 AD3d 707 [2009] [where the defendant claimed that the complainant was injured as the result of her own reckless conduct, counsel's election not to also pursue a justification defense was not ineffective, since it avoided presenting to the jury two dramatically inconsistent defenses which could well have caused the jury to disbelieve the defendant altogether and reject both defenses], *affd* 15 NY3d 811 [2010]; *People v Davis*, 293 AD2d 486 [2002] [counsel not ineffective for failing to pursue a justification charge where that defense would have been weak and inconsistent with the facts of the case]; *People v Rhodes*, 281 AD2d 225 [2001] [counsel was not ineffective for failing to raise a justification defense that would have been weak, at best, and which might

have undermined a stronger defense]; *People v Vukel*, 263 AD2d 416 [1999] [it was sound strategy for counsel to refrain from raising a weak justification defense in order to concentrate, instead, on other defenses], *abrogated on other grounds by People v Wells*, 24 NY3d 971 [2014]). In sum, after fully informing his client of the available defenses and their ramifications, and after having the trial court do the same, the defendant's trial counsel adhered to the defendant's reasonable election of a viable defense, and ably presented a tenable misidentification argument to the jury. The fact that the chosen defense proved unsuccessful, and that counsel did not pursue the questionable and inconsistent justification defense, simply cannot be equated with ineffective assistance of counsel. Accordingly, the defendant received meaningful legal representation (*see People v Baldi*, 54 NY2d 137 [1981]), and the defendant's contrary assertion " 'confus[es] true ineffectiveness with mere losing tactics and accord[s] undue significance to retrospective analysis' " (*People v McGee*, 20 NY3d 513, 521 [2013], quoting *People v Benevento*, 91 NY2d at 712).

## III. Court's Alleged Charge Omission

Independent of defense counsel's alleged ineffectiveness in failing to present a justification defense and to request a justification charge against his client's wishes and in conflict with his client's intelligently chosen defense, the defendant maintains that the trial court erred in failing to, sua sponte, provide the jury with a justification instruction. This argument is premised upon a twofold analysis—first, that the court's obligation to charge on justification arises from its general duty to provide instructions on the material legal issues in a case, and second, that the court did not adequately respond to the jury's note referencing self-defense because it did not provide a sua sponte instruction on justification. These arguments are unpreserved for appellate review and, in any event, are without merit.

Initially, the record establishes that the defendant's current challenge to the adequacy of the court's charge was never raised at the trial level. Indeed, neither the defendant nor his counsel requested the submission of the justification instruction to the jury; rather, they adamantly opposed any reference to that defense in the court's charge. Under these circumstances, the defendant's contention that such an instruction should have been given is unpreserved for appellate review

(*see People v Acevedo*, 84 AD3d 1390 [2011]; *People v Johnson*, 75 AD3d 426 [2010]; *People v Moore*, 66 AD3d 707 [2009]; *People v Hesterbay*, 60 AD3d 564 [2009]; *People v Rodriguez*, 52 AD3d 399 [2008]; *People v Palladino*, 47 AD3d 491 [2008]; *People v Rhodes*, 281 AD2d 225 [2001]). In any event, for the reasons that follow, that contention is unpersuasive.

Turning to the merits, we note at the outset that we need not decide today whether there may ever exist circumstances in which an accused's choice of defense is so ill-conceived and facially lacking in merit, and another defense is so clearly applicable to the given facts, that a trial court might be warranted in charging the latter defense against the accused's wishes. Rather, we only determine that where, as in this case, an instruction regarding such a defense is adamantly opposed by the defendant and his counsel, would logically conflict with the defendant's well-considered defense choice, and possesses only tenuous applicability to the facts of the case, "the risk attendant upon [presenting inconsistent defenses] should not [be] foisted on [the defendant] against his will" (*People v Bradley*, 88 NY2d 901, 904 [1996]; *see People v DeGina*, 72 NY2d at 777). As previously noted, this is precisely such a case.

It is true that a trial court must instruct the jury regarding the fundamental legal principles applicable to the case (*see* CPL 300.10 [2]), and "[w]hen evidence at trial viewed in the light most favorable to the accused, sufficiently supports a claimed defense, the court should instruct the jury as to the defense, and must when so requested" (*People v Watts*, 57 NY2d 299, 301 [1982]). This rule encompasses the defense of justification (*see People v Petty*, 7 NY3d 277, 284 [2006]; *People v McManus*, 67 NY2d 541, 549 [1986]; *People v Jenkins*, 93 AD2d 868 [1983]).

However, with regard to the foregoing, a long line of Appellate Division decisions establishes that where an instruction on the defense of justification would interfere with the accused's chosen defense theory, the trial court is under no obligation to charge justification sua sponte (*see e.g. People v Perez*, 123 AD3d 592, 593 [2014] [where the defense challenged the credibility of prosecution witnesses and highlighted the lack of corroborating physical evidence, the court was not required to charge justification since "a sua sponte justification charge would have interfered with defendant's strategy"]; *People v Acevedo*, 84 AD3d 1390 [2011] [court was not required to charge justification sua sponte where the defendant argued that he

lacked the requisite intent to be charged as an accessory]; *People v Kin Wong*, 81 AD3d 421 [2011] [an unrequested justification charge would have improperly interfered with the defendant's own theory of an accidental stabbing, and the court was under no obligation to deliver such an instruction sua sponte]; *People v Johnson*, 75 AD3d 426 [2010] [sua sponte justification charge would have interfered with the defense strategy, since the defendant unquestionably has the right to chart his own defense]; *People v Moore*, 66 AD3d 707 [2009] [court was under no obligation to give justification charge where it would interfere with defense that the complainant caused her own injury]; *People v Palladino*, 47 AD3d 491 [2008] [sua sponte justification charge would have unlawfully interfered with the defense strategy charted by the defendant]; *People v Rhodes*, 281 AD2d 225 [2001] [sua sponte delivery of justification charge would have been inconsistent with the defense strategy]; *People v Vukel*, 263 AD2d 416 [1999] [sua sponte presentation of justification issue to jury would have interfered with the defense strategy]; *People v Castano*, 236 AD2d 215 [1997] [court was under no obligation to give justification charge sua sponte where the defense proceeded on an "all or nothing" strategy based on credibility issues]; *see generally People v Wright*, 288 AD2d 28 [2001] [there was no reason for the court to deliver an agency charge sua sponte where the defendant asserted a completely different defense at trial]). In view of these decisions, the trial court in the present case clearly acted appropriately and in accordance with established precedent in respecting the defendant's chosen defense of misidentification, and in declining to dilute that defense with an inherently antagonistic sua sponte justification charge.

■ Several arguments are presented in opposition to the above conclusion. None of them is persuasive. Initially, the defendant contends that since justification is an ordinary defense that must be disproved beyond a reasonable doubt by the prosecution (*see* Penal Law § 25.00 [1]; *People v Steele*, 26 NY2d 526, 528 [1970]), and since the evidence in this case which allegedly supported that defense was elicited on the prosecution's direct case rather than presented by the defendant, the risk that the jury would perceive the factual inconsistency between the proffered misidentification defense and a justification charge is ameliorated. However, as we already have observed in our discussion of the defendant's ineffective assistance of

counsel claim, regardless of the manner in which the justification defense arises, its submission to the jurors still would have required their instruction that the defendant claims not to have been the person who shot the victims, but if in fact he was that person, then the jury should further consider whether his shooting of the decedent was justified. The jury thus would be asked to weigh factually inconsistent defense scenarios in which the defendant either did not commit the homicide at all, or was legally justified in committing it, a prospect that must necessarily detract from the potential persuasiveness of his misidentification defense.

The defendant further contends that, even if the possibility of prejudice from the presentation of inconsistent defenses initially existed in this case, such potential prejudice dissipated when the jurors sent a note to the court regarding whether the element of intent to kill would be negated if Jamel Wisdom, the homicide victim, "initiated the struggle" and the defendant merely "act[ed] defensively." The defendant seizes on this note as a clear indication that the jury already had effectively rejected the misidentification defense at this point, thus paving the way for a sua sponte instruction on justification unimpeded by the risk of prejudice arising from the presentation of inconsistent defenses. However, while the jury's note may have cast some doubt upon the continuing viability of the misidentification defense, it does not follow, as the defendant assumes, that the jurors had unanimously rejected that defense at that juncture in the case. Rather, that assumption is premised upon, and asks us to engage in, speculation regarding the jury's deliberations and thought processes, a practice from which the courts consistently have been instructed to refrain precisely because the unpredictability of jury deliberations renders such intrusion into this realm an exercise fraught with uncertainty (*see generally People v Abraham*, 22 NY3d 140, 146 [2013]; *People v Medina*, 18 NY3d 98, 105 [2011]; *People v Muhammad*, 17 NY3d 532, 545 [2011]; *People v Rayam*, 94 NY2d 557, 561-562 [2000]; *People v Wells*, 18 AD3d 482, 483 [2005]; *People v Hazlewood*, 297 AD2d 752, 753 [2002]). To illustrate this point, it is equally possible that the jurors, or at least some of them, may still have been wrestling with the misidentification defense at that time, and were merely curious as to the potential applicability of self-defense to the case based on the final few seconds of the surveillance video recording that they viewed at the trial. Such curiosity on the part of the jury would

hardly authorize the court to undermine the defendant's intelligently chosen misidentification defense or to override his explicit request that the questionable defense of justification not be presented to the jury. In short, it was the defendant's informed decision to persist in his misidentification defense notwithstanding the contents of the jury's note, and it was not the place of the trial court to have compelled him to adopt a tenuous alternative defense that he already had explicitly and knowingly disavowed and that the prosecution had no opportunity to counter, nor should this reviewing Court require such a result. In light of these circumstances, "the jury's note did not obligate the court to instruct the jury on a matter that had not been at issue during the trial" (*People v Hesterbay*, 60 AD3d at 566), and the court fulfilled its obligation to respond meaningfully to the note by advising the jurors that they had not been instructed on the law of self-defense and should instead focus on the issues that had been submitted for their consideration (*see People v Rodriguez*, 52 AD3d 399 [2008]).

The defendant further argues that the video recording of the brief struggle between Wisdom and the defendant, in combination with the jury note, demonstrates that the applicability of the justification defense to the facts of this case was so clear and obvious that the trial court was required to charge justification sua sponte, notwithstanding the contrary wishes of the defendant and his counsel. However, while we agree that a generous view of the evidence in the light most favorable to the defendant could have supported the submission of a justification instruction in this matter, the inquiry does not end there. Rather, the issue is whether the trial court was *obligated* to give that charge when the instruction would interfere with the defendant's own well-considered choice of a misidentification defense based on his claim of actual innocence, the defendant and his counsel affirmatively opposed any justification instruction for that very reason, and the proposed justification defense had little prospect of succeeding.

As to the foregoing factors, we already have noted the long line of precedents from our Court which hold that a trial court need not charge justification sua sponte where that defense theory would logically conflict with another defense chosen by the defendant. Reliance upon the decisions of the Appellate Division, First Department, in *People v Copeland* (216 AD2d 55 [1995]), *People v Schwartz* (168 AD2d 251 [1990]), and *People v Rodwell* (100 AD2d 772 [1984]) as authority to the contrary is

unavailing, since those matters are factually distinguishable. Indeed, in each of those cases, and in virtually all of the decisions upon which our dissenting colleagues rely, the defendants took the stand at trial and *admitted* to engaging in the risk-creating conduct that resulted in harm to the victim, whereas the instant defendant steadfastly insisted that someone other than him committed the shootings. Accordingly, unlike the instant case, the submission of the justification defense in those matters would not have been fatally inconsistent with the defenses that had already been proffered by each accused. Furthermore, neither the defendant nor defense counsel in those cases affirmatively opposed a justification instruction; rather, they simply failed to request one, and the evidence in support of justification in each of those cases was quite strong. Conversely, the defendant and his counsel herein adamantly refused a justification defense and instruction precisely because they would conflict with the misidentification defense and had only tenuous evidentiary support in the record.

For much the same reasons, the reliance on our Court's decision in *People v Rivera* (74 AD2d 589 [1980]) is misguided. While it appears from the brief decision in *Rivera* that the accused in that case denied assaulting the two victims, there was also substantial evidence of justification adduced at trial. However, the trial court did not give a justification instruction to the jury, and the defendant neither requested such a charge nor objected to the court's failure to give it. On appeal, this Court reversed the judgment of conviction, determining that the evidence of justification was so strong that the instruction should have been given despite the defendant's failure to request it. Of course, in the present case, the defendant did not merely fail to request a justification instruction; he unequivocally opposed it. Moreover, as hereinafter explained, the applicability of justification to the facts of this matter is questionable at best. Thus, the *Rivera* case is factually inapposite to the present matter and fails to advance the defendant's position on this appeal.

This Court's decisions in *People v Giamanco* (188 AD2d 547 [1992]) and *People v Jenkins* (93 AD2d 868 [1983]) also provide no support for the defendant's position that the trial court should have given a justification charge over his affirmative objection. Those cases are manifestly inapplicable to the instant facts. In *Giamanco*, as in the previously discussed First Department cases, the accused *admitted* that he committed the act

which led to the victim being shot, but merely denied that the shooting was intentional. Moreover, he opposed the submission of a justification charge on the legally erroneous ground that justification applies only to offenses that have a specific intent to harm as an element, but the trial court disagreed and instructed the jury with respect to that defense. We affirmed, noting established law that the defense of justification applies to a defendant's risk-creating conduct, even when that conduct results in unintended consequences (*see People v Giamanco*, 188 AD2d at 547, citing *People v Magliato*, 68 NY2d 24, 28 [1986], and *People v McManus*, 67 NY2d 541 [1986]; *see also People v Padgett*, 60 NY2d 142, 146 [1983]). Since the defendant in *Giamanco* opposed a justification charge only on the mistaken basis that the defense applies exclusively to crimes involving an intent to harm, we upheld the trial court's rejection of that argument and its giving of the charge.

Reliance upon *People v Jenkins* (93 AD2d 868 [1983]) is similarly misplaced. There, we determined that where the accused produced evidence that the victim, who allegedly was the aggressor, was stabbed during a struggle with the accused over a knife, justification should have been charged to the jury "despite the testimony on the record that [the accused] specifically declined the charge" (*id.* at 869). In so determining, we noted that the strong animosity between the accused and his trial counsel in that case, and the accused's own indication that he actually expected a justification charge, rendered counsel's declination of the charge suspect, thus "provid[ing] sufficient cause for finding that defense counsel's unequivocal statement that defendant did not request the justification charge should not be deemed a waiver by [the accused] of his right to the charge" (*id.*). Accordingly, this discord between the accused and his counsel, and their apparent disagreement over the use of the justification defense, rendered the circumstances in *Jenkins* so unique that the decision is essentially limited to its facts.

In stark contrast to the foregoing cases, the defendant herein never admitted that he committed any acts in connection with the shooting of either of the victims; rather, he vehemently denied any involvement in those crimes and insisted that someone else was responsible, as was his fundamental right. Moreover, he affirmatively opposed the submission of any justification theory to the jury based on his view that it would interfere with his claim of innocence and compromise his defense of mistaken identity. Given the voluntary and informed nature of

this choice and, as discussed below, the far from compelling nature of the purported justification evidence, neither the defendant nor his counsel can be faulted for rejecting the potential justification argument, and the trial court did not err in failing to charge it sua sponte.

The jury note regarding self-defense, and the current argument by the defendant that justification actually was the overarching issue in this case, are premised upon the few seconds of video in which the unarmed Wisdom and the man identified as the defendant, brandishing a handgun, struggled in the lobby of the defendant's apartment building. However, while this brief portion of the video, standing alone, might be consistent with a layman's understanding of a possible self-defense scenario, the legal reality is quite different, and the evaluation of the defendant's conduct must be guided by applicable principles of law rather than visceral reactions to portions of the evidence. Indeed, Penal Law § 35.15 (2) authorizes the use of deadly physical force against another only when the actor reasonably believes that the other's use of such force is imminent, and even then, inter alia, only if the actor is unable to retreat with complete personal safety and is not the initial aggressor (see People v Petty, 7 NY3d 277, 285 [2006] ["(w)hen justification is in issue, the trier of fact must first determine whether the defendant was the initial aggressor"]; People v Cotsifas, 100 AD3d 1015 [2012] [evidence that the accused was the initial aggressor, or failed to satisfy the duty to retreat, negates justification defense]; People v Crique, 63 AD3d 566, 567 [2009] [justification defense is dependent on evidence that the accused was not the initial aggressor and satisfied the duty to retreat]; People v Williams, 112 AD2d 176, 177 [1985] [defendant not entitled to avail himself of justification defense where evidence demonstrated that he was the initial aggressor and there was no indication that he withdrew from the encounter and communicated that withdrawal]).

Here, the defendant's final struggle with Wisdom did not occur in a vacuum, and a complete and legally proper analysis of the justification issue requires the consideration of those circumstances which preceded that struggle. To that end, the record reveals that after being abused by his persecutors, the defendant was indeed able to successfully retreat to the safety of his fifth-floor apartment. Once there, he could have alerted the authorities to the attack on his person or, if he deemed the incident too insignificant for their intervention, he simply could

have waited there until the group outside dispersed. However, the defendant did neither. In this regard, it is correctly observed that the defendant was not obligated to become a prisoner in his own home or to indefinitely forsake his normal routine simply because his group of tormentors remained outside. However, it is clear that nothing of that sort occurred here. Rather, the defendant did not seek to enlist the aid of law enforcement, but instead, in a clear act of vigilantism, hurriedly entered the apartment with Morrison, procured a handgun, and rushed back outside to renew the confrontation, all in less than 60 seconds. Angered by the indignities he had suffered at the hands of the group, and confident in the knowledge that he was now armed, he actively sought out his attackers, walking into the street and shouting and gesturing at the others. Although there is no evidence that anyone made any threat toward him at that time, he retrieved the gun from Morrison and, seconds later, shot the fleeing Talleyrand. When the unarmed Wisdom approached him immediately thereafter, the defendant backed up toward the entrance of the building's public lobby before briefly struggling with Wisdom and then shooting him six times. Hence, any suggestion that the struggle between the two men in the lobby was a discrete and unprovoked event simply finds no support in the record; rather, the surveillance video recordings themselves demonstrate that these events were part of a single, ongoing incident in which the defendant readily cast himself in the role of the proverbial man who brings a gun to a fistfight. In seeking out his persecutors and then shooting one of them, he assumed the mantle of the aggressor. Moreover, there is no evidence that the defendant withdrew from the encounter and communicated that withdrawal to Wisdom. Therefore, there is little realistic possibility that a jury, properly instructed on the defense of justification (see 1 CJI[NY] 35.15 [2] [a]), and dutifully following the law, including the principle that the defense is not available to the aggressor, could have found for the defendant on that issue. Under these circumstances, the defendant had every right to pursue the comparatively stronger, albeit ultimately unpersuasive, misidentification defense, and to explicitly reject its dilution by the submission of an improbable justification charge. Likewise, under the facts of this case, the trial court cannot be faulted for its failure to ride roughshod over the defendant's claim of innocence, as well as his chosen defense and express wishes, by presenting such a dubious instruction for the jury's

consideration. Accordingly, reversal in the interest of justice on this basis is not warranted.

## IV. Sentencing

 Finally, the defendant's contention that the sentences imposed upon him improperly penalized him for exercising his constitutional right to remain silent at sentencing is unpreserved for appellate review (*see People v Hurley*, 75 NY2d 887 [1990]; *People v Seymore*, 106 AD3d 1033 [2013]; *People v Romero*, 101 AD3d 906 [2012]; *People v Nelson*, 77 AD3d 973 [2010]). In any event, this contention is without merit. Here, the record reveals no suggestion of retaliation or vindictiveness toward the defendant for declining to make a statement at sentencing. Rather, in imposing sentence, the Supreme Court properly considered appropriate factors, including the defendant's lack of remorse (*see People v Seymore*, 106 AD3d 1033 [2013]; *People v Garcia*, 46 AD3d 573 [2007]; *People v Cato*, 5 AD3d 394 [2004]; *People v Riley*, 152 AD2d 757 [1989]; *People v Aylesworth*, 143 AD2d 353 [1988]; *see also United States v Keskes*, 703 F3d 1078 [7th Cir 2013]; *Burr v Pollard*, 546 F3d 828 [7th Cir 2008]; *El v Artuz*, 105 F Supp 2d 242 [SD NY 2000]). Moreover, under the circumstances presented, the challenged terms of imprisonment were not excessive (*see People v Crandall*, 172 AD2d 618 [1991]; *People v Suitte*, 90 AD2d 80 [1982]).

Accordingly, the judgment is affirmed.

MILLER, J. (dissenting). I am compelled to dissent because the fact remains that the evidence presented in this case raises an issue of fact as to whether the defendant was acting in self-defense. Review of the numerous surveillance videos plainly raises the issue, as it did for defense counsel, the trial judge, and the uninstructed jury. Rather than address the defendant's contention on the merits, however, the People ask this Court to refrain from exercising its interest of justice jurisdiction, and thereby avoid consideration of the underlying issue. When the merits are reached, however, it cannot be disputed that the evidence presented in this case warranted a justification instruction as a matter of law.

The People fail to adequately address the defendant's separate contention that he was deprived of the effective assistance of counsel when his attorney refrained from exercising his own professional judgment as to matters of trial tactics and strategy throughout the course of the trial. The People ask this

Court to propound a novel legal doctrine in order to decide this point in their favor, contending that the decision of whether to request a justification instruction is ultimately reserved to the defendant, who must now personally consent to any action by defense counsel or the court that may implicate this issue. There is no legal precedent for this position and, in fact, the case law indicates that matters of strategy and tactics are ultimately left to the professional judgment of counsel. In this case, the record demonstrates that defense counsel failed to exercise his own professional judgment due to his erroneous belief that he was prohibited from doing so. This failure worked to deprive the defendant of his right to counsel under the State and Federal Constitutions. Accordingly, the defendant is entitled to a new trial, and the judgment must be reversed.

## I. Background

The defendant was charged with, inter alia, murder in the second degree and assault in the second degree. At his trial, on the People's direct case, a witness (hereinafter the eyewitness) testified that she was present with the defendant—who was then 18 years old—on East 17th Street in Brooklyn at about 10:00 p.m. on September 22, 2008, when she witnessed more than five people "beating [the defendant] up." The group of attackers laughed at the defendant, called him "a pussy and [was] trying to punk him." During the course of the beating, the defendant's eye bled and his assailants kicked him while he lay on the ground. At one point during the attack, the eyewitness heard the defendant say, "They got a knife, they are going to cut me."

The eyewitness testified that after the attackers relented, she walked the defendant to his residence on East 19th Street. However, the defendant's attackers pursued them. The eyewitness testified that the other individuals "[were] beating [the defendant] up again and they pushed him in the trash." The eyewitness testified that the defendant was able to reach his residence and he went upstairs with his friend. The defendant and his friend both came back downstairs and went back out into the street. Some time later, the eyewitness heard gunshots, but she did not see where the gunshots came from or who was shooting. Upon hearing the gunshots, the eyewitness ran from the scene.

An individual named Gamard Talleyrand was also called by the People and testified that on September 22, 2008, he fought

the defendant in the presence of a number of his friends. Talleyrand stated that "[t]here were numerous fights . . . that day" and explained that he was "kind of beating [the defendant] up." The fight ended in front of the defendant's residence when Talleyrand "just stopped." Talleyrand did not observe where the defendant went after he stopped beating him up. Talleyrand testified that he was sitting in front of the defendant's residence with his friends when he glanced around and saw the barrel of a gun. Talleyrand did not see who was holding the gun. He started running and was struck by a bullet in his calf.

The People also presented recorded footage from several video surveillance cameras which showed the lobby of the building where the defendant resided, the doorway leading to the lobby, and the courtyard outside of the doorway. The eyewitness, who had known the defendant for about five years and had spent time with the defendant and his cousin, identified an individual in the video wearing a white T-shirt as the defendant. The defendant's face was clearly visible on a number of the videos from a variety of angles. Talleyrand, who was compelled to testify involuntarily for the People pursuant to a material witness order, stated that, to him, the surveillance videos "just look[ed] like a movie," and he denied that he was able to identify any of the numerous individuals depicted in the portions of the surveillance footage shown to him at trial.

Review of the lobby video shows that the defendant entered the building and went upstairs with another male for about a minute. The defendant and the other male returned downstairs and left the building shortly thereafter. The courtyard video shows that the defendant walked out into the street until he was out of the view of that camera. The other male remained at the entrance to the courtyard. After a period of time elapsed, the defendant returned into the view of the courtyard camera, appearing agitated, and the other male gave him what appeared to be a handgun. The defendant again walked into the street and out of the view of the surveillance cameras. After another period of time elapsed, bystanders began to run.

The defendant then returned into the view of the courtyard camera, walking backwards and holding a handgun at his side. An unidentified individual in a hooded sweat shirt (hereinafter the unidentified individual) appeared to gesture and shout at the defendant, and he backed the defendant into the courtyard of his building and out of the view of the courtyard camera.

Jamel Wisdom, who was wearing a black sweat shirt and walking purposefully with his head down and hood up, immediately followed the defendant and the unidentified individual into the courtyard.

Inside cameras depicted the defendant back up to the doorway of his building, where Wisdom confronted him. Wisdom moved forward and attacked the defendant. The defendant moved backwards into the doorway of the building. A struggle between the two men ensued, spilling back into the lobby of the building and across to the far wall. Wisdom slammed the defendant's back against the far wall of the lobby and the two continued to grapple with each other around the lobby until Wisdom abruptly fell to the floor with the defendant on top of him. The entire struggle lasted for only a few moments. The unidentified individual ran over and pulled the defendant and Wisdom apart. The defendant ran from the lobby. The unidentified individual kneeled down, appeared to take something out of Wisdom's pocket, and fled the scene. Wisdom later died.

Medical evidence presented by the People demonstrated that the decedent sustained six gunshot wounds, including a graze wound, and entrance wounds on his right forearm, the back of his right arm, his left shoulder, and his left chest, and above his right ear. An autopsy revealed that the gunshot wounds were sustained at very close range. Expert testimony indicated that nine cartridge casings recovered from the street and the building lobby were all fired from the same semiautomatic handgun.

At the end of the first day of the trial, defense counsel informed the court that he felt compelled to make a record to explain why he was not raising certain defenses that were available to the defendant by virtue of the People's evidence:

> "[DEFENSE COUNSEL]: Judge, I've been assigned pursuant to 18B to represent this defendant. Based on the evidence in this particular case I had suggested to the defendant as Your Honor realized before we even started the case of a disposition with far less time involved if he were to be convicted.
>
> "I have at this point—I was advised by the defendant in court he did not wish to take any type of plea. Today after listening to some of the testimony I suggested to the Court that I may be able to use

some of the evidence here particularly [the decedent] who went into the building for what purposes.

"I suggested that there is a defense called reduced murder which transfers a murder two into a manslaughter one because it happened in certain circumstances or mental capacity—

"THE COURT: Extreme emotional disturbance defense.

"[DEFENSE COUNSEL]: Extreme emotional distress. I've advised him I suggested I would do that but I would need the defendant's permission to make such an argument before the Judge. Whether Your Honor would grant it or not based on the evidence is something that I did not discuss with him. I just said that if you say no then I will not even question anybody with respect to why [the decedent] went into the building and why other aspects of the case are. The defendant has told me and he said no way. I do not wish to have you indicate in any manner, shape or form as far as justification or diminished capacity on the murder two. Without his permission I've told him I cannot do it. The answer was no way."

The court thereafter engaged in the following colloquy with the defendant:

"THE COURT: All right, Mr. Clark, you understand what counsel is saying? . . . I mean the most common defense obviously [is] you got the wrong guy, it wasn't me. Other times in a homicide case based on the circumstances the defendant may raise the claim, well, I did it but I thought he was going to kill me so it was self defense. Or third in some cases that whatever the circumstances were, even though I did it[,] I did it under an extreme emotional disturbance and, therefore, the law says that if established [it] might reduce a murder charge to a manslaughter charge, do you understand what I'm saying?

"THE DEFENDANT: I understand. I comprehend, Judge.

"THE COURT: Have you had an adequate op-

portunity to discuss these various legal issues and tactical decisions with your attorney?

"THE DEFENDANT: Yes.

"THE COURT: And we've indicated now in open court that at least to the justification or self defense claim or the extreme emotional disturbance, . . . [h]ave you had a chance to discuss that?

"THE DEFENDANT: I did.

"THE COURT: And your attorney says that as a tactical decision which you're entitled to make, that you don't want to pursue those defenses in terms of justification and or extreme emotional disturbance, is that correct?

"THE DEFENDANT: That is correct.

"THE COURT: Anybody force you or threaten you in any way to make that decision?

"THE DEFENDANT: No.

"THE COURT: Anybody make any promises to you to get you to make that decision?

"THE DEFENDANT: No, sir.

"THE COURT: You doing so voluntarily in full recognition of the potential consequences?

"THE DEFENDANT: I am not making any decision . . . referring to you reducing it to any manslaughter or anything like that cause this is not me.

"THE COURT: Okay. All right."

Defense counsel stated that, without permission from his client, he would "not even question anybody with respect to why [the decedent] went into the building." Consistent with this position, defense counsel tried the case on the theory that the defendant was not the individual depicted on the surveillance video recordings. He made no mention of justification or self-defense to the jury and made no attempt to cultivate the record with respect to that issue.

At the charge conference after the parties had rested, defense counsel did not request that the jury receive instruction on the defense of justification and the court did not instruct the jury on that defense. In his summation, defense counsel argued

that the defendant was not the individual depicted in the video recordings or the person who shot the deceased victim.

On the second day of deliberations, the jurors sent a note which asked, among other things, "[W]ith respect to [the decedent] if he initiated the struggle [and the defendant] was acting defensively does that negate intent to kill[?]"

Defense counsel argued that the court should not instruct the jurors on the defense of justification. He stated, "[T]he [c]ourt is aware that I have been instructed to use only one defense . . . that the defendant is not the one in the tapes." After a conference off the record, defense counsel objected "to any reference to self defense." Defense counsel additionally objected to any response that would "advis[e] the jury that [the] issue [of justification] was not before them and they're not to rule on it." Defense counsel argued that the jury should only be instructed that they must determine whether the defendant had the intent to kill.

The court proceeded to re-charge the jury with respect to intent. The court also addressed the jurors' question regarding the law of self-defense:

> "Now under the law there is a concept in the law called justification, self defense. It requires a number of factors to be present. You were not instructed on what's commonly called the law of self defense. What you were instructed on is the issue of intent that is in order for the People to prove beyond a reasonable doubt that the defendant is guilty of [m]urder in the [s]econd [d]egree, what they have to prove is that the defendant here acted with the intent to cause the death of another when that person's conscious objective or purpose is to cause the death of another. That is the—what you have to focus on; whether or not the defendant intended to cause the death of [the decedent] in that causing his death was his conscious objective or purpose."

Defense counsel objected to the court's instruction.

The jury found the defendant guilty of murder in the second degree and assault in the second degree. The defendant was subsequently sentenced to an indeterminate term of imprisonment of 20 years to life on the conviction on murder in the second degree and a consecutive determinate term of imprisonment of five years on the conviction of assault in the second degree.

## II. Discussion

The defendant appeals, arguing, among other things, (a) that the verdict of guilt of murder in the second degree was based upon legally insufficient evidence and against the weight of the evidence, (b) that the trial court erred in failing to instruct the jury on the law of justification since the evidence presented in this case raises an issue of fact as to whether the defendant was acting in self-defense, and (c) that he was deprived of the effective assistance of counsel when his attorney failed to exercise his own professional judgment as to matters of trial tactics and strategy due to his erroneous belief that he was prohibited from doing so.

A. Legal Sufficiency and Weight of the Evidence

The defendant's contention that the evidence was legally insufficient to support his conviction of murder in the second degree because the People failed to prove the element of intent to kill is unpreserved for appellate review (*see* CPL 470.05 [2]; *People v Hawkins*, 11 NY3d 484, 491-492 [2008]; *People v Brummel*, 103 AD3d 805, 805 [2013]; *People v Hollman*, 98 AD3d 584, 585 [2012]; *People v Arias*, 64 AD3d 786, 787 [2009]). However, I agree that the merits of this contention should be reached in the interest of justice. Viewing the evidence in the light most favorable to the prosecution (*see People v Contes*, 60 NY2d 620, 621 [1983]), it was legally sufficient to establish the defendant's guilt of that crime when considered in light of the trial court's charge as given without exception (*see People v Ford*, 11 NY3d 875, 878 [2008]; *People v Rogers*, 94 AD3d 1152, 1152-1153 [2012]).

Additionally, in fulfilling this Court's responsibility to conduct an independent review of the weight of the evidence (*see* CPL 470.15 [5]), the verdict of guilt with respect to the count of murder in the second degree was not against the weight of the evidence (*see People v Danielson*, 9 NY3d 342, 349 [2007]; *People v Romero*, 7 NY3d 633 [2006]). It must be stressed, however, that the weight of the evidence review performed by this Court on this appeal does not include an evaluation of the evidence as it pertains to the defense of justification. Even if this Court were to conclude, as a factual matter, that the evidence demonstrated that the defendant was legally justified in shooting the decedent, this Court would not have the authority to vacate the murder conviction on that ground since this Court is constrained to weigh the evidence in light of the crime *as it was charged to the jury* without objec-

tion by the defendant (see *People v Johnson*, 10 NY3d 875 [2008]; *People v Danielson*, 9 NY3d at 349; *People v Cooper*, 88 NY2d 1056, 1058 [1996]; *People v Rogers*, 94 AD3d at 1152-1153). In other words, this Court, like the jury in this case, is compelled to make its factual findings regarding guilt or innocence as though the defense of justification does not exist as the law of this state. Given this mandatory constraint, the jury's verdict was not against the weight of the evidence.

B. The Trial Court's Instructions to the Jury

The defendant next contends that the trial court erred in failing to instruct the jury on the law of justification since the evidence presented in this case raises an issue of fact as to whether the defendant was acting in self-defense. The defendant concedes that this issue is unpreserved for appellate review. The People argue that the issue should not be considered on the merits since the defendant's attorney failed to preserve the issue. Tellingly, the People do not dispute the substantive merits of the defendant's argument and do not dispute that a justification instruction was warranted by the evidence that they presented.

i. Preservation

A review of this Court's case law indicates that this Court and the other Appellate Divisions have consistently reached this identical issue in the interest of justice (see e.g. *People v Jenkins*, 93 AD2d 868, 869 [1983] [reversing murder conviction as a matter of discretion in the interest of justice where the defendant failed to request a justification instruction]; *People v Rivera*, 74 AD2d 589, 589 [1980] [the trial court's failure to charge justification was reversible error and "(e)ven if defendant may be deemed to have acquiesced in the trial court's instructions . . . reversal is still mandated in the interest of justice"]; *People v Benjamin*, 47 AD2d 861, 861-862 [1975] ["(t)he failure of the trial court to instruct the jury on (justification) requires a reversal and a new trial" and "(t)he fact that no exception was taken to the charge as given and that no request to charge was made is of no moment . . . where a (homicide) conviction is founded upon an erroneous charge" (internal quotation marks omitted)]; see also *People v Schwartz*, 168 AD2d 251, 253 [1990] [where the court erred in failing to give justification charge that was warranted by the evidence, the Appellate Division, First Department, concluded that "(s)uch error, despite defense counsel's failure to request the charge or to except to the charge provided, requires a reversal

and a new trial"]; *People v Rodwell*, 100 AD2d 772, 773 [1984] ["(a)lthough no exception was taken to the court's charge, justice requires a reversal and new trial" since "(t)he jury may well have found that justification was not disproven but convicted defendant anyway under the mistaken impression that it was permissible to do so"]; *People v Butts*, 14 AD2d 486, 487 [1961] ["(n)otwithstanding the failure of defense counsel to except to the charge, the inadequacy of the court's charge with respect to self-defense substantially prejudiced defendant's rights, and 'error so fundamental, so substantial' requires a new trial in the interests of justice" (quoting *People v Creasy*, 236 NY 205, 221 [1923])]).

The only other two cases from this Department which speak to this issue *both* reach the substantive merits of the defendant's unpreserved contention that the trial court should have instructed the jury on justification (*see People v Acevedo*, 84 AD3d 1390 [2011]; *People v Moore*, 66 AD3d 707 [2009]). Although, in those cases, this Court ultimately concluded that the defendant was not entitled to a justification instruction, this Court nevertheless exercised its interest of justice jurisdiction to address the substantive merits of the defendant's arguments (*see People v Acevedo*, 84 AD3d 1390 [2011]; *People v Moore*, 66 AD3d 707 [2009]). In both cases there was no reasonable view of the evidence that would have supported a justification instruction, so the defendant's failure to request one was, in a sense, academic (*see People v Acevedo*, 84 AD3d 1390 [2011]; *People v Moore*, 66 AD3d 707 [2009]). Unlike those cases, however, the evidence in this case raises a triable issue of fact as to whether the defendant was acting in self-defense.

There is not a single case from this Department where this Court has refused to consider the merits of this type of argument on a direct appeal. Accordingly, I would reach this issue in the interest of justice, and determine whether, as a matter of law, the evidence presented in this case raises an issue of fact as to whether the defendant was acting in self-defense (*see People v Acevedo*, 84 AD3d 1390 [2011]; *People v Moore*, 66 AD3d 707 [2009]; *People v Jenkins*, 93 AD2d 868 [1983]; *People v Rivera*, 74 AD2d 589 [1980]; *People v Benjamin*, 47 AD2d 861 [1975]).

ii. The Merits

"The defense of justification . . . affirmatively permits the use of force under certain circumstances" (*People v McManus*, 67 NY2d 541, 545 [1986]; *see* Penal Law art 35). "The defense

does not operate to excuse a criminal act, nor does it negate a particular element of a crime" (*People v McManus*, 67 NY2d at 546). "Rather, by recognizing the use of force to be privileged under certain circumstances, it renders such conduct entirely lawful" (*id.*).

"In any prosecution for an offense, justification . . . is a defense" (Penal Law § 35.00). "When a 'defense,' other than an 'affirmative defense,' . . . is raised at a trial, the people have the burden of disproving such defense beyond a reasonable doubt" (Penal Law § 25.00 [1]).

"Of course, justification, as an affirmative element, need not be disproved in every case" (*People v Steele*, 26 NY2d 526, 528 [1970]). As indicated, the statute only requires the People to disprove justification when the defense "is raised at . . . trial" (Penal Law § 25.00 [1]).

Unlike certain other legislatively-defined defenses, a defendant is not statutorily required to provide the People with advance notice of a justification defense (*cf.* CPL art 250), or to specifically plead justification (*cf.* CPL 220.15). "Ordinarily, the possibility of the defense would not appear until injected by the defendant" (*People v Steele*, 26 NY2d at 528). However, the prosecution's case, viewed separately, may itself raise an issue of fact as to whether the defendant was justified in using force such that his or her conduct was entirely lawful (*see id.* at 528-529; *People v Zayas*, 88 AD3d 918, 920 [2011]).

So long as the evidence in the case is sufficient to support it, a court may be required to give an instruction on the defense of justification notwithstanding the fact that the defendant has taken an inconsistent position in his or her testimony before the jury (*see People v Butts*, 72 NY2d 746, 750 [1988]; *People v Perry*, 61 NY2d 849, 850-851 [1984]; *People v Padgett*, 60 NY2d 142, 145 [1983]; *People v Watts*, 57 NY2d 299, 301 [1982]). Similarly, a court may be required to give an instruction on the defense of justification even though defense counsel did not explicitly argue to the jury that the defendant was justified (*see People v Khan*, 68 NY2d 921, 922 [1986]).

"To place a defense in issue, 'all that is required is evidence of the defense, which if credited, is sufficient to raise a reasonable doubt' " (William C. Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 25.00, quoting *People v Butts*, 72 NY2d at 749 n 1). "A trial court must charge the jury with respect to the defense of justification whenever, viewing the record in the light most favorable to the

defendant, there is any reasonable view of the evidence which would permit the jury to conclude that the defendant's conduct was justified" (*People v Fermin*, 36 AD3d 934, 935 [2007]; *see People v Petty*, 7 NY3d 277, 284 [2006]; *People v Butts*, 72 NY2d at 750; *People v Perry*, 61 NY2d at 850-851; *People v Padgett*, 60 NY2d at 145; *People v Watts*, 57 NY2d at 301; *see also Mathews v United States*, 485 US 58, 63 [1988]).

Here, viewing the record in the light most favorable to the defendant, there was a reasonable view of the evidence which would permit the jury to conclude that the defendant's conduct was justified with respect to the count of murder in the second degree. The surveillance video recordings presented by the People on their direct case showed that after shooting at Talleyrand, the defendant retreated back to his residence and was pursued by other members of the group that had attacked him earlier. A reasonable juror could conclude, based on the testimony at trial, that the defendant thought that at least one of his attackers possessed a knife and intended to use it against him. The videos show that the defendant retreated until he was backed up by the two other men to the door of his residence, where he was attacked. The decedent appeared to reach for the defendant's gun and slammed him against the back wall of the lobby. Viewing the evidence in the light most favorable to the defendant, a reasonable juror could conclude that the defendant's action in defending himself against the decedent's attack was justified (*see generally People v Zayas*, 88 AD3d 918, 920 [2011]).

The majority states that the legal reality of self-defense differs from a layman's understanding, an observation which itself demonstrates the necessity of a jury instruction on this subject. The argument advanced is that the defendant could not have been justified because he readily assumed the role of the initial aggressor of this single, continuing incident and that the defendant failed to satisfy a duty to retreat into his residence where he simply could have waited until the group outside dispersed.

It is true that "an individual is not justified in using deadly force against another, even if he reasonably believes that person is about to use deadly physical force against him, if he knows that he can, with complete safety to himself and others, retreat" (*People v Lopez*, 200 AD2d 767, 768 [1994]; *see* Penal Law § 35.15 [2] [a]). However, the People's "burden of proving beyond a reasonable doubt that the defendant knew he could

have retreated in complete safety . . . relate[s] to that point in time when . . . the defendant actually exerted deadly physical force against the decedent" (*People v Simmons*, 206 AD2d 550, 553 [1994]). Accordingly, under New York law, "the justification defense remains available even if a prudent person in the defendant's position might have retreated earlier, or avoided the area where the potential assailant was to be found" (*Davis v Strack*, 270 F3d 111, 127 [2d Cir 2001]; *see People v Magliato*, 68 NY2d 24, 30 [1986]; *People v McManus*, 67 NY2d at 549; *People v Simmons*, 206 AD2d at 552-553).

Accepting the premise that the defendant assumed the role of the aggressor because he was obliged to stay off of public streets and confine himself indefinitely to his residence so as to avoid any confrontation with his attackers "would ultimately mean that victims of threats of violence must either give up their habitat or lose their right to self defense" (*Davis v Strack*, 270 F3d at 128 n 6). However, that is not the law of New York, and the defendant "was not obligated to withdraw from the place where he made his life, on pain of losing his right of self defense, merely because a tormentor . . . was also to be found on the same streets" (*id.*). "He was obligated to retreat (if that was safely possible) only when he faced imminent deadly force" (*id.*; *see People v Magliato*, 68 NY2d at 30; *People v McManus*, 67 NY2d at 549; *People v Simmons*, 206 AD2d at 552-553).

It is a mischaracterization of the record to refer to these repeated beatings of the defendant by a group of five or more individuals as a fistfight. Furthermore, the analysis of the defendant's options underscores a failure, in considering this issue, to view the evidence *in the light most favorable to the defendant*, rather than in the light most favorable to the prosecution (*see People v Petty*, 7 NY3d at 284; *People v Butts*, 72 NY2d at 750; *People v Perry*, 61 NY2d at 850-851; *People v Padgett*, 60 NY2d at 145; *People v Watts*, 57 NY2d at 301). Any fair view of the evidence in this case raises an issue of fact as to whether the defendant acted in lawful self-defense. Indeed, the People do not dispute that the surveillance video recordings raise a question of fact as to the defendant's self-defense with respect to the count of murder in the second degree.

Instead, the People argue that the trial court lacked the authority to instruct the jury on self-defense in the absence of explicit authorization from the defendant. This legal conclusion has no basis in either the relevant statutes or the case law.

As a general matter, "[a]t the conclusion of the summations, the court must deliver a charge to the jury" (CPL 300.10 [1]).

"In its charge, the court must state the fundamental legal principles applicable to criminal cases in general" (CPL 300.10 [2]). In addition, "[t]he court must also state the material legal principles applicable to the particular case, and, so far as practicable, explain the application of the law to the facts" (CPL 300.10 [2]). "Both before and after the court's charge, the parties may submit requests to charge, either orally or in writing, and the court must rule promptly upon each request" (CPL 300.10 [5]).

The duty to instruct the jury on the material legal issues in a case is statutorily distinct from the parties' right to request certain instructions or language (*see* CPL 300.10 [2]). In other words, notwithstanding the fact that the parties are authorized to request specific charges, a court is independently required, as a general matter of law, to "state the material legal principles applicable to the particular case" (CPL 300.10 [2]).

This independent duty stems from constitutional considerations, for, as the Court of Appeals has recognized, "the right to trial by jury . . . so jealously guarded, lose[s] force without a . . . Judge to insure . . . that the jury is correctly instructed" (*People v Charles F.*, 60 NY2d 474, 480 [1983]). Indeed, the right to a trial by jury, as conferred by the New York Constitution, requires not simply a collection of jurors, but a jury that has been "instruct[ed] . . . on the law of the case" (*People v Ahmed*, 66 NY2d 307, 311 [1985]).

The People's contention that the trial court in this case lacked the authority to instruct the jury on the law of justification in the absence of the defendant's consent is predicated on a recent line of Appellate Division cases which conclude, usually as an alternative holding, that the failure to give a justification charge, sua sponte, was not error since such an instruction could have interfered with an inconsistent defense strategy (*see People v Perez*, 123 AD3d 592 [2014]; *People v Acevedo*, 84 AD3d at 1390-1391; *People v Kin Wong*, 81 AD3d 421, 421-422 [2011]; *People v Johnson*, 75 AD3d 426, 426 [2010]; *People v Moore*, 66 AD3d at 709-710; *People v Palladino*, 47 AD3d 491, 492 [2008]; *People v Rhodes*, 281 AD2d 225, 226 [2001]; *People v Vukel*, 263 AD2d 416, 416-417 [1999], *abrogated on other grounds by People v Wells*, 24 NY3d 971 [2014]).

These cases all either quote or otherwise rely upon a Court of Appeals case in which the Court concluded that the trial

court erred in giving an instruction on entrapment where such an instruction was opposed by defense counsel (*see People v De-Gina*, 72 NY2d 768 [1988]). In that case, defense counsel had not argued to the jury that the defendant had been induced by police to sell drugs, but rather, that the defendant had not sold any drugs at all (*id.* at 776). In concluding that it was error to instruct the jury on entrapment over the defendant's objection, the Court cited two broad considerations.

First, the Court of Appeals recognized that a defendant "unquestionably has the right to chart his own defense" and that "by informing the jury that defendant was claiming he had sold the drugs as a result of the officer's inducement, the trial court placed defendant in the midst of contradictory defenses on the critical question of whether he had or had not sold any drugs" (*id.* at 776-777). The Court noted that it was inappropriate to force the defendant to adopt contradictory positions since to do so "not only risks confusing the jury as to the nature of the defense but also may well taint a defendant's credibility in the eyes of the jury" (*id.* at 777).

The second consideration cited by the Court of Appeals pertained to the fact that entrapment is an affirmative defense (*see id.* at 777). Accordingly, by instructing the jury on the law of entrapment, the trial court "imposed on defendant an affirmative burden of proof he had not undertaken by his defense theory" (*id.*). The Court went on to note that the defendant did not "make any affirmative effort to meet his burden of showing a lack of disposition to commit the charged crimes, as it was his claim that they had never happened at all," and that "the jury was bound to conclude he had failed to sustain" the affirmative burden imposed by the trial court's entrapment instruction (*id.*).

In formulating the oft quoted statement that a defendant has the right to chart his own defense, the Court of Appeals cited exclusively to a decision from the Appellate Division, Fourth Department, which contains similar language and analysis in the context of the same affirmative defense—entrapment (*see People v Martin*, 66 AD2d 995, 995-996 [1978]). The only subsequent case from the Court of Appeals where this issue was addressed involved another affirmative defense—extreme emotional disturbance (*see People v Bradley*, 88 NY2d 901 [1996]).

The People are unable to cite a single case which holds that a trial court is precluded, in the absence of the defendant's

consent, from instructing the jury on an *ordinary* defense that is otherwise supported by the evidence. This distinction is critical, since the imposition of an affirmative defense necessarily requires a defendant to address that issue through the submission of evidence to sustain the affirmative burden of proof imposed upon him or her. In the case of an ordinary defense, however, the People bear the additional burden of proof and it is unnecessary for the defendant to embrace that position in front of the jury (*see People v Khan*, 68 NY2d 921, 922 [1986]), or to otherwise address it at all (*cf. People v DeGina*, 72 NY2d at 777).

Indeed, there are numerous appellate cases which have reversed convictions due to the trial court's failure to instruct the jury, sua sponte, on the defense of justification (*see e.g. People v Copeland*, 216 AD2d 55, 57 [1995] [judgment reversed where trial court "err(ed) in failing to charge justification, sua sponte" (emphasis omitted)]; *People v Schwartz*, 168 AD2d at 253 [where court erred in failing to give justification charge warranted by the evidence, the Appellate Division, First Department, concluded that "(s)uch error, despite defense counsel's failure to request the charge or to except to the charge provided, requires a reversal and a new trial"]; *People v Rodwell*, 100 AD2d at 773 ["(a)lthough no exception was taken to the court's charge, justice requires a reversal and new trial" where "(t)he jury may well have found that justification was not disproven but convicted defendant anyway under the mistaken impression that it was permissible to do so"]; *People v Jenkins*, 93 AD2d at 869 ["it was error for the court not to charge justification . . . despite the testimony on the record that defendant specifically declined the charge of justification"]; *People v Rivera*, 74 AD2d at 589 ["(t)he trial court's failure to charge justification," sua sponte, required reversal in the interest of justice]; *People v Benjamin*, 47 AD2d at 861-862 ["(t)he failure of the trial court to instruct the jury on (justification) requires a reversal and a new trial," and "(t)he fact that no exception was taken to the charge as given and that no request to charge was made is of no moment . . . where a (homicide) conviction is founded upon an erroneous charge" (internal quotation marks omitted)]).

For instance, in *People v Jenkins* (93 AD2d 868 [1983]), this Court concluded that the trial court erred in failing to instruct the jury on the law of justification since the jury could have reasonably concluded that the victim was the aggressor and

that he was killed by the defendant during a struggle. Notably, this Court stated that "it was error for the court not to charge justification. This is so despite the testimony on the record that defendant *specifically declined the charge of justification*" (*id.* at 869 [emphasis added]). This Court reversed the judgment of conviction as a matter of discretion in the interest of justice (*see id.*).

This Court has previously spoken on this issue, and explicitly rejected the position that a court lacks the authority to instruct a jury on justification "over [the defendant's] objection" (*People v Giamanco*, 188 AD2d 547, 547 [1992] ["(w)e reject the defendant's contention that he was deprived of a fair trial by the court giving a charge on justification *over his objection*" (emphasis added)]; *see People v Blouin*, 223 AD2d 650, 650 [1996] ["(t)he defendant's contention that the court improperly charged the law of intoxication, *over his objection*, is without merit" where there was sufficient evidence on the record for a reasonable person to entertain doubt as to the element of intent on that basis (emphasis added)]).

The need in this case for a jury instruction on the law of justification was further amplified by the fact that the jury itself requested an instruction on self-defense, sending a note which asked, among other things, "[W]ith respect to [the decedent] if he initiated the struggle [and the defendant] was acting defensively does that negate intent to kill[?]" The jury's request for instruction on the defense of justification could hardly have come as a surprise to either the court or the parties in light of the depiction of the incident on the surveillance video recordings which would naturally lead the average individual to the commonsense application of one of the most popular and widely-known defenses in the history of criminal jurisprudence (*cf. People v Gonzalez*, 22 NY3d 539 [2014]). The recorded footage from the surveillance cameras gave the jurors what amounted to a firsthand view of the final altercation and, together with the other evidence at trial, provided reason to conclude that the defendant was justified in firing the gun to defend himself after being attacked in the doorway of his building.

The fundamental requirement that a jury be instructed on the law is safeguarded, in part, through statutory procedures afforded to the jury itself. The Criminal Procedure Law provides that "[a]t any time during its deliberation, the jury may request the court for further instruction or information

with respect to the law" (CPL 310.30). "Upon such a request, the court must direct that the jury be returned to the courtroom and . . . must give such requested information or instruction as the court deems proper" (CPL 310.30).

"The answering of such questions is no mere matter of conventional procedure" (*People v Gonzalez*, 293 NY 259, 263 [1944]). "It is an integral part of the structure of an adequate trial" (*id.* at 263). Although the Court of Appeals has recognized that "[t]he trial court . . . is vested with some measure of discretion in framing its response" to a jury request, "that discretion is circumscribed . . . by the requirement that the court respond meaningfully to the jury's request for further instruction or information" (*People v Malloy*, 55 NY2d 296, 302 [1982]; *see People v Almodovar*, 62 NY2d 126, 131 [1984]; *see also People v Miller*, 6 NY2d 152, 156 [1959]; *People v Gezzo*, 307 NY 385, 396 [1954]; *People v Lupo*, 305 NY 448, 452 [1953]; *People v Gonzalez*, 293 NY at 263).

Here, the trial court failed to respond meaningfully to the jury's request for further instruction. The People nevertheless argue that the court did not err since a justification instruction could have distracted the jury from the defendant's misidentification theory in that it would have required the jury to consider two inconsistent scenarios.

However, when the jury sent a note requesting to be instructed on the law it should apply if the defendant was acting defensively, it should have been apparent that the jury was already considering these inconsistent scenarios. The jury did not need instruction or argument to be alerted to the issue of justification since that defense was raised by the evidence itself and would have been apparent to anyone who watched the surveillance video recordings. Under such circumstances, there was minimal risk that a supplemental instruction on justification would have had any effect on the jury's consideration of the defendant's misidentification theory.

Indeed, this Court has previously addressed a nearly identical situation and has cited to a similar jury note as grounds for reversal. In *People v Rivera* (74 AD2d at 589), this Court concluded that "[t]he trial court's failure to charge justification based upon defendant's denial that he assaulted the officers was improper." This Court stated that "[e]ven if defendant may be deemed to have acquiesced in the trial court's instructions . . . reversal is still mandated" (*id.*). This Court reasoned that "[i]f the jury had been properly charged on self-defense, it

might have decided on the evidence adduced that defendant's actions were . . . completely justified" (*id.*). This Court continued, "[i]ndeed, the jury was clearly considering such possibilities, as indicated by its question to the court: 'If we are debating about self-defense, does that have to come into the picture of intent?' " (*Id.*) In light of these concerns, this Court reversed the judgment of conviction as a matter of discretion in the interest of justice (*see People v Rivera*, 74 AD2d 589 [1980]). *Rivera* is not the only case to have reached such a conclusion based, in part, upon the existence of a jury note requesting instruction on the law of self-defense (*see People v Copeland*, 216 AD2d 55, 57 [1995] [reversing where the trial court failed to give a justification instruction, sua sponte, despite a note from the jury inquiring whether they could "base a not guilty verdict on 'self-defense' "]).

Furthermore, a supplemental justification instruction in this case would not have forced the defendant to adopt a defense that was inconsistent with his chosen defense theory or otherwise abridged his right to chart his own defense. The defendant was permitted to control the evidence that was presented to the jury on his behalf and to choose which of the available theories were advocated by his attorney to the jury. Under the circumstances of this case, it would have been unnecessary for the trial court to instruct the jury that the defendant was asserting a theory of self-defense, or that he was otherwise advocating inconsistent defenses. The jury simply could have been instructed that the evidence presented by the People had raised an issue of fact as to whether the individual depicted in the surveillance video recordings was acting in self-defense and that it was the People's burden to disprove justification beyond a reasonable doubt (*cf. People v Bradley*, 88 NY2d 901 [1996]; *People v DeGina*, 72 NY2d 768 [1988]; *People v Martin*, 66 AD2d 995, 995-996 [1978]).

Finally, the record does not support the conclusion that the defendant's colloquy with the trial court demonstrated that he waived his right to have the jury instructed on the law of justification. As discussed more fully below, the court and defense counsel improperly conveyed to the defendant that he alone was responsible for deciding among the alternative defense theories available to him. Furthermore, the defendant was not informed that he could obtain a justification instruction without testifying and without having his attorney embrace that theory in front of the jury. In addition, review of the

colloquy shows that defense counsel and the court lumped the defense of justification together with the affirmative defense of extreme emotional disturbance, failing to elicit an understanding of the important evidentiary differences between the two types of defenses. The defendant's lack of understanding as to these basic issues is apparent on the face of the record in his final statement to the court, when he indicated that he did not want to pursue a justification defense because it would only "reduc[e] it to . . . manslaughter." As already indicated, the defendant's statements evince a fundamental misunderstanding of the law of justification, and any contention that the defendant knowingly and intelligently waived his right to an instruction on this issue is without merit (*cf. People v Ahmed*, 66 NY2d at 311).

In sum, it is undisputed that the evidence in this case presented issues of fact as to whether the defendant was justified, and although the jury itself sought instruction on this issue, the trial court failed to meaningfully respond to the jury's request. Under the circumstances presented here, there is a very real possibility that the jury in this case would have found that the defendant was justified in killing the decedent during the struggle that ensued after he was attacked in the lobby, but that the jury nevertheless convicted the defendant on the mistaken belief that it could not consider whether the defendant was justified (*see People v Schwartz*, 168 AD2d at 253; *People v Rodwell*, 100 AD2d at 772-773; *People v Jenkins*, 93 AD2d 868 [1983]; *People v Rivera*, 74 AD2d 589 [1980]).

C. Ineffective Assistance of Counsel

The trial court's error in failing to instruct the jury on the law of justification does not provide grounds for reversing the defendant's conviction of assault in the second degree since there was no reasonable view of the evidence that would have supported a justification instruction with respect to that charge. The defendant nevertheless maintains that his assault conviction should be overturned since he was deprived of the effective assistance of counsel. I conclude that the defendant was deprived of the effective assistance of counsel since his attorney failed to exercise his own professional judgment as to matters of trial tactics and strategy throughout the course of the trial.

An "essential ingredient in our system of criminal jurisprudence, rooted deeply in our concept of a fair trial within the adversarial context" (*People v Felder*, 47 NY2d 287, 295-296

[1979]), is the right to the assistance of counsel guaranteed under both the Federal and State Constitutions (*see* US Const Amend VI; NY Const, art I, § 6; *People v Turner*, 5 NY3d 476, 479 [2005]; *People v Benevento*, 91 NY2d 708, 711 [1998]). Under the federal standard for ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" (*Strickland v Washington*, 466 US 668, 694 [1984]). Under the state standard, the constitutional require- ments for the effective assistance of counsel "are met when the defense attorney provides meaningful representation" (*People v Stultz*, 2 NY3d 277, 279 [2004] [internal quotation marks omit- ted]; *see People v Baldi*, 54 NY2d 137 [1981]). The state stan- dard has been called "somewhat more favorable to defendants" (*People v Turner*, 5 NY3d at 480), because its "prejudice component focuses on the fairness of the process as a whole rather than its particular impact on the outcome of the case" (*People v Caban*, 5 NY3d 143, 156 [2005] [internal quotation marks omitted]; *see People v Ozuna*, 7 NY3d 913, 915 [2006]; *see also Rosario v Ercole*, 601 F3d 118, 124-125 [2d Cir 2010]).

Regardless of the relative strengths of each of the available defense theories, i.e., whether the misidentification defense was at least as strong as the justification defense, it is not our function in reviewing this issue on appeal to second-guess choices made by a defense attorney, or to retroactively weigh the relative merits of each of the legal theories made available by the evidence (*see People v McGee*, 20 NY3d 513, 520-521 [2013]).

Indeed, "[i]n many cases, there may be strategic reasons for a lawyer's choice" to pursue or discard any particular defense theory (*People v Nesbitt*, 20 NY3d 1080, 1081 [2013]). "For that reason, claims of ineffective assistance based on such choices must usually be adjudicated in posttrial motions, so that evi- dence may be presented to show why counsel acted as he did" (*id.* at 1082). But a case such as this, "where the lawyer explained his thinking in plain language on the record, is an exception: The record permits us to decide the claim on direct appeal" (*id.*).

In this case, the record demonstrates that defense counsel did not exercise any professional judgment in deciding how to try this case. Defense counsel made it clear on the record that

it was his belief that his client had the absolute final authority over what trial strategy to employ. Accordingly, defense counsel consistently emphasized that he was not exercising his own professional judgment, but rather, that of his 21-year-old client who, the record discloses, did not have an adequate grasp of the legal theories available to him. For instance, during the trial, defense counsel stated that, without permission from his client, he would "not even question anybody with respect to why [the decedent] went into the building," where he attacked the defendant. When the jury requested to be instructed on the law of justification, defense counsel indicated that he was foreclosed from exercising his own professional judgment, stating "the [c]ourt is aware that I have been instructed to use only one defense."

The record reflects that in defense counsel's view, he was bound to follow the strategy and tactics dictated by his 21-year-old client throughout the course of the trial: in his opening statement, cross-examinations, summation, jury charge, and response to the jury's note. Defense counsel's failure at every stage of the trial to exercise any professional judgment as to basic matters of trial tactics and strategy deprived the defendant of his right to the effective assistance of trial counsel under both the State and Federal Constitutions (see US Const Amend VI; NY Const, art I, § 6).

The proposition that defense counsel in this case properly refused to exercise his own professional judgment since the defendant had the right to chart his own defense, and that counsel could not override the defendant's wishes by advancing an inconsistent defense based on counsel's view of the evidence, is a novel interpretation of the scope of a defense counsel's duty.

"[A] defendant, having accepted the assistance of counsel, retains authority only over certain fundamental decisions regarding the case such as whether to plead guilty, waive a jury trial, testify in his or her own behalf or take an appeal" (People v Colon, 90 NY2d 824, 825-826 [1997] [internal quotation marks omitted]; see People v White, 73 NY2d 468, 478 [1989]; see also Jones v Barnes, 463 US 745, 751 [1983]; accord ABA Standards for Criminal Justice, Defense Function, standard 4-5.2: Control and Direction of the Case [3d ed 1993]). "Said differently, '[b]y accepting counseled representation, a defendant assigns control of much of the case to the lawyer, who, by reason of training and experience, is entrusted with

sifting out weak arguments, charting strategy and making day-to-day decisions over the course of the proceedings' " (*People v Parker*, 290 AD2d 650, 651 [2002], quoting *People v Rodriguez*, 95 NY2d 497, 501-502 [2000]).

The United States Supreme Court has recognized that "[a]lthough there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer has—and must have—full authority to manage the conduct of the trial" (*Taylor v Illinois*, 484 US 400, 417-418 [1988] [footnote omitted]). "The presentation of a criminal defense can be a mystifying process even for well-informed laypersons" (*Gonzalez v United States*, 553 US 242, 249 [2008]), and "[t]he adversary process could not function effectively if every tactical decision required client approval" (*Taylor v Illinois*, 484 US at 418). "This is one of the reasons for the right to counsel" (*Gonzalez v United States*, 553 US at 249).

> "Numerous choices affecting conduct of the trial, including the objections to make, the witnesses to call, and the arguments to advance, depend not only upon what is permissible under the rules of evidence and procedure but also upon tactical considerations of the moment and the larger strategic plan for the trial" (*id.*).

"In exercising professional judgment, moreover, the attorney draws upon the expertise and experience that members of the bar should bring to the trial process" (*id.*).

Here, contrary to the majority's conclusion, the decision of whether to interpose a defense of justification ultimately laid with defense counsel, not the defendant. This decision required an evaluation of the case, analysis of the evidence, and learned consideration of each of the legal theories made available by the evidence (*cf. People v Colville*, 20 NY3d 20, 29 [2012]; *People v Ferguson*, 67 NY2d 383, 390 [1986]). Such considerations unquestionably implicate trial strategy and tactics, the hallmarks of matters ultimately left to the professional judgment of defense counsel (*see People v Colville*, 20 NY3d at 28-29).

The People's reliance on *People v Petrovich* (87 NY2d 961 [1996]) and *People v DeGina* (72 NY2d 768 [1988]) is misplaced. Those cases involved the affirmative defenses of entrapment and extreme emotional disturbance (hereinafter EED) (*see People v Petrovich*, 87 NY2d at 963; *People v DeGina*, 72 NY2d at 775). Unlike an entrapment or an EED defense, a justification defense is not an affirmative defense which requires the

defendant to bear "a substantial burden in asserting [it]" (*People v DeGina*, 72 NY2d at 775; *compare People v Petrovich*, 87 NY2d at 963). Rather, the People are required to disprove justification beyond a reasonable doubt (*see People v Steele*, 26 NY2d at 528). In addition, unlike the defense of justification, "the EED defense can be given to the jury only upon a defendant's request; the People may not seek and a court may not submit this defense to the jury over a defendant's objection" (*People v Colville*, 20 NY3d at 32; *compare* CPL 300.10 [2]).

Defense counsel was mistaken in his belief that he was forestalled from exercising his own professional judgment and compelled to let his client decide matters of tactics and strategy. This is not a case where, "after consulting with and weighing the accused's views along with other relevant considerations," defense counsel made the decision to reject a justification defense in favor of a misidentification defense (*People v Colville*, 20 NY3d at 32; *compare People v Alvarez*, 106 AD3d 568, 568-569 [2013]). Defense counsel deferred completely to the defendant's wishes in this matter because he was under the mistaken impression that he was required to do so (*see People v Nesbitt*, 20 NY3d at 1081; *People v Lee*, 120 AD3d 1137, 1137-1138 [2014]). Viewing the process as a whole, the defendant did not receive meaningful representation and was deprived of "the expert judgment of counsel to which the Sixth Amendment entitles him" (*People v Colville*, 20 NY3d at 32).

### III. Conclusion

In light of the foregoing, the defendant is entitled to a new trial. Accordingly, I vote to reverse the judgment.

Ordered that the judgment is affirmed.

SGROI and COHEN, JJ., concur with MASTRO, J.P.; MILLER, J., dissents in a separate opinion in which HINDS-RADIX, J., concurs.