This opinion is uncorrected and subject to revision before
publication in the New York Reports.
--------------------------------------------------------------------

No. 199
The People &c.,
          Respondent,
       v.
Anthony V. Pavone,
          Appellant.


          Paul J. Connolly, for appellant.
          Nicholas J. Evanovich, III, for respondent.


RIVERA, J.:

     Defendant Anthony Pavone challenges his conviction on two

counts of first degree murder, and one count of criminal

possession of a weapon in the second degree.  It is undisputed

- 1 -

that defendant killed two people.  The sole issue at trial was whether at the time of the murders he labored under an Extreme Emotional Disturbance (EED).  On appeal, defendant asserts two errors of constitutional dimension: first, that the People violated his right to remain silent, and second, that he was denied a fair trial due to defense counsel's ineffectiveness.  A new trial is not warranted on either ground, and we therefore affirm the Appellate Division.

I.

Defendant shot to death his former long-time lover, Patricia Howard, and her romantic partner, Timothy Carter.  Much of the evidence is uncontested, but the question of defendant's emotional state at the time of the killings is disputed. Defendant admitted the shootings but presented an EED defense based on his contention that at the time he was depressed and, in a state of anguish, lost rational control of his behavior.  In support, he testified on his own behalf and presented medical expert testimony of his emotional condition.

The People contested defendant's interpretation of the evidence and argued that he was fabricating an EED defense. According to the People, defendant stalked and sought to control Howard, and acted out of jealousy and anger when he shot them. Since there were no eyewitnesses to the murders, the People relied on forensic evidence to reconstruct the shootings and

testimony from witnesses about defendant's actions, as well as his emotional and physical condition in the hours surrounding the murder, to show that he acted calmly and rationally, including testimony from an expert on EED.  The People also played for the jury several recorded voice messages that defendant left on the victims' cellular telephones close in time to the murders, which the People claimed evinced that his emotional state was one of frustration and anger.

Defendant and Howard were romantically involved for ten years, including while he was married to Howard's sister-in-law, and after they divorced their respective spouses.  The relationship was tumultuous, and included several break ups.  According to Howard's daughter, Howard considered the relationship over in the weeks before the murders.

Defendant discovered that Howard had started a relationship with Carter, and in the days and hours before shooting the victims, defendant left several voice messages on Howard's phone, declaring his love, and begging her to take him back and rekindle their romantic relationship.  In some of his messages he would refer to Carter and question whether they were out together.  He found Carter's phone and address through the internet and left messages for him as well, including one in which he said he loved Howard and that if Carter did not return his call he would look for him and find him, and, if necessary, he would sit in front of his home.  When neither Howard nor Carter called back, defendant

would leave more messages demanding that they return his calls.

Hours before the murder, defendant left another message for Howard in which he said he had previously left a message for Carter and that "one of you, if you're together, one of you has got to call me."  He further stated that "this is wrong. . . . I'm not ready to give up on you yet."  He said he would drive up to Carter's home, and that he "need[ed] another chance with [Howard] . . . . And then if it doesn't work out, [Carter] can have you because it would have been my fault again."  In a statement that would prove prescient, he ended the message with, "God I hope you're not up at his house."

Defendant cited his growing frustration as he continued to leave messages for Howard. In defendant's last message to Howard, less than four hours before her death, he stated "I'm not going to go away, I'm really starting to get frustrated tonight." About an hour later, he left a message for Carter, declaring he was looking for his girlfriend, complaining again that Carter did not return his calls, and reiterated that he was getting frustrated.

Approximately two hours after this call, defendant arrived at Carter's home in Clinton County armed with a .357 magnum revolver, which he testified he carried because he was allegedly afraid of a former tenant whom he had evicted.  To find Carter's apartment, defendant used a ruse in which he knocked on the doors of the two nearby tenants and pretended to be a fellow neighbor

looking for Carter.  One of the tenants who responded to defendant would testify at trial that about 20-25 minutes after defendant left, she heard two people screaming, then a statement from a man and another from a woman, followed by two gunshots less than a minute apart.

The People played a recording of a 911 call placed by Howard just before the shootings during which she stated that defendant was knocking on the door and she wanted him to leave. On the 911 tape that was played for the jury, Howard can be heard saying "What Tony?  What are you doing here?  You're not getting a hug." The State Trooper who received the call testified at trial that the caller's voice was calm and that he could hear a male voice in the background.

Physical evidence from the forensic investigation indicated that defendant fired two shots through the front door, went inside, and shot Howard twice from an upward angle, which suggested that he stood over her as she was bent over or kneeling. He then shot Carter in the shoulder and fired a second, fatal shot at close range.  He reloaded his gun and left the spent casings on a coffee table.  Blood imprints indicated that he stepped on Howard's back as he made his way past her body.

Defendant fled the scene and the county.  Five days later, the police located him at a hotel, registered under a false name. Defendant eventually surrendered to police after speaking with a negotiator for several hours.  A recording of that conversation

was submitted into evidence.  When he was arrested defendant had $400 in cash on his person, and a gun, ski mask, and several survival supplies in his possession, including emergency blankets, hand warmers and a pocket knife.  He had also removed the battery from his cell phone, which he claimed was to avoid phone calls, but which also ensured that he could not be tracked by the phone's GPS.

After his arrest, defendant was immediately read his Miranda rights.  Defendant was then transported to the State Police station in Binghamton. During his transport he did not say anything to the police.  He was later reread his rights before being transported to the airport for a flight back to Clinton County.  At some point he mumbled that he should have shot himself in the head when he had the chance, and during the flight defendant broke down and cried.  At trial, without objection, the prosecutor elicited testimony that defendant said nothing else while being transported.

In support of his EED defense, defendant took the stand and generally testified as to his background, and his physical and emotional condition at the time of the shooting.  Defendant stated that he was a former marine before becoming a corrections officer.  He left the corrections department after he was assaulted by an inmate.  During the assault he suffered a concussion, and his forehead and eye socket fractured in five places.  Afterwards, the defendant saw numerous physicians and

psychiatrists, and was prescribed medicine such as Zoloft, an antidepressant and anti-anxiety drug, Zanax, another anti-anxiety drug, and Adderoll, used to treat inertia and lack of energy.

At trial, defendant also presented his version of the events, which was jumbled and difficult to follow during the course of his testimony.  According to defendant, his relationship with Howard was on and off for years, and there was nothing unusual happening between them at the time of her death.  He testified that he was not certain if Howard was with Carter and that she had visited him on her birthday, just two days before the shootings, and they had oral sex.  He acknowledged leaving the phone messages, but stated that he was confused and that he and Howard were calling each other.  He claimed that the day before the shootings, he was physically and mentally "fried."  Defendant denied intending to kill the victims, and said "I just needed her that night.  I just needed somebody that night."

In describing the events at Carter's apartment, he testified that when he knocked on Carter's door Howard, dressed only in a bathrobe, answered. He asked her what she was doing there.  He told her that he needed her and asked to let him sleep inside the door.  It was around this time that Howard called 911.

According to defendant, Howard said something like, "what's the matter with you.  You don't get it.  What do I have to do, what do I have to do" then she asked whether she had to have sex with Carter in front of defendant.  Defendant testified he felt

distraught at what she said and threw himself at the door, and fired two shots through the glass.  He thought Carter said he had a gun on him.  Defendant claimed he then stuck the gun through the window and fired it because he thought Carter had fired at him.  He claimed he had been crying on and off the entire time, that he was not perceiving things, and that he was delusional. He further claimed that he did not remember much of what occurred and struggled to recall the killings.  In describing his state of mind he said he "wasn't there for a lot of it."

He also testified that he had contemplated suicide months before the killings, and that afterwards he considered suicide and while sitting in his truck he wrote a will.  He said he told the police when he was in custody that he wished he had killed himself when he had the chance.

On cross-examination, the court permitted the prosecutor, over defense counsel's objection, to ask defendant if, while in custody, he had told the police what happened the night of the shootings.  Defendant answered he could not because he did not remember it all.  In response to the prosecutor's questions about when he discovered that he had suffered from EED, defendant explained that he first learned of EED when his daughter sent him information about this and other defenses.

He also claimed that when he first spoke with Howard she told him to go home, and that he then walked back to his truck and drove away, but after traveling less than 200 feet, he turned

around. In response to the prosecutor's questioning as to why he could not let Howard go, he responded because he did not know how long she had been seeing Carter and because she should have told him.  He further admitted that he was jealous of Howard, and that he was eager to speak with Carter to find out if he knew about defendant and how much he loved Howard.

With respect to the shooting, he insisted that the gun went off accidentally the first time, and after two shots he immediately entered the apartment and ran towards Carter, expecting to be shot.  Some of his answers were contradictory in the same breath.  For example, he said Carter grabbed him, then said maybe he didn't.  He said Carter hit him, then immediately said that he did not hit him. Several times he stated that he could not fully remember the events.  On re-cross, he testified that when he killed the victims he felt hurt and distraught, but was not angry or jealous.

Defendant presented expert testimony provided by a forensic psychiatrist, who opined that when defendant shot the victims he suffered an emotional break constituting EED.  The expert based his opinion on two interviews with defendant, his medical records, and transcripts of the 911 call, defendant's phone messages and the hotel negotiation.  The expert also referenced New York's law and various articles on EED, including one by the People's expert.  He explained that someone suffering from EED can still act intentionally or make premeditated plans.  Thus,

even if defendant purposefully went to Carter's home with the intention to kill the victims, those actions did not preclude a finding of EED. While he admitted on cross-examination that he did not have access to the audio recordings of the 911 tape or voice messages, and that it would have been "quite useful and important" to listen to the messages, he nevertheless testified that he did not need to hear these recordings in order to render an opinion.

The defense expert also testified as to defendant's medical condition. He explained that defendant had been suffering from Post-Traumatic Stress Disorder (PTSD) since the inmate assault, and his PTSD exacerbated a pre-existing major depressive disorder. He explained that these factors, combined with the current stress he was facing, indicated that defendant suffered from EED while searching for Howard, and her comment to him regarding sex with Carter provided a breaking point where he lost control of his actions. The expert further stated that based on his conversations with defendant and his reading of the transcript of the negotiation at the hotel, in his opinion, defendant was entertaining suicidal thoughts during the negotiation.

In rebuttal, the People submitted testimony from a forensic psychologist, who was lead author on a major scholarly article on EED. The People's expert opined that defendant had not been suffering under EED when he killed Howard and Carter. He based

his opinion on an interview with defendant and the audio recordings between defendant and Howard, as well as the recording between defendant and the negotiator. He highlighted that he, unlike defendant's expert, had listened to the audio recordings of the 911 calls and voice mails, which he believed were important to discerning defendant's true mental state. In his opinion, defendant demonstrated a need to control Howard and that his actions, both preceding and immediately after the murders, indicated that he was not suffering from PTSD or EED.

The expert stated that defendant placed himself in this stressful situation and avoided taking any steps to alleviate his stress, such as engaging in an in-depth conversation with his psychiatrist, whom he met with for 10 minutes the day before the murders. Importantly, he explained that the defendant acted rationally immediately prior to the murders -- quickly locating Carter's address on the internet, calmly speaking to Carter's neighbors, creating a cover story for why he was there at 3:00 a.m., and discerning Carter's exact apartment. The defendant also drove away from Carter's house only to immediately return, and he entered the house, rather than leaving as someone who suffers from PTSD would do, when the gun went off. Overall, he described defendant's actions as "more consistent with what stalkers do" rather then someone suffering from EED.

As relevant here, on summation, defense counsel sought to address what appeared to be a weakness in the defense expert's

testimony.  Counsel explained for the jury that he received the CD with audio recordings of the phone messages and 911 tapes at the last minute and as a result chose not to provide his expert with those audio recordings because it would delay the trial a week.  Instead, he provided him with the transcripts, which he argued was enough. During the People's summation, and without objection, the prosecutor emphasized defendant's failure to report the killings to the police and to inform the police about his EED defense when he was taken into custody.

The jury deliberated for approximately three hours before returning guilty verdicts on all charges.  The court thereafter sentenced defendant to concurrent terms of life imprisonment without parole on each murder count and ten years' imprisonment, followed by 5 years' post-release supervision, on the weapons possession count.

The Appellate Division affirmed, with one Justice dissenting (117 AD3d 1329 [3d Dept 2014]).  The court concluded that the admission of testimony regarding defendant's post-Miranda silence was harmless error because there was overwhelming evidence of guilt beyond a reasonable doubt and defendant failed to establish his EED defense.  The dissent would have reversed because the evidence against the EED defense was not so overwhelming to support a conclusion that there was no reasonable possibility that use of defendant's silence affected the jury's rejection of the defense (id. at 1337 [Garry, J. dissenting]).  A judge of

this Court granted defendant leave to appeal (24 NY3d 963
[2014]).


                              II.

        On appeal, defendant claims that the People improperly used
defendant's silence, in the immediate aftermath of his arrest,
against him, violating his constitutional rights and requiring
reversal of his conviction and a new trial.  In addition,
defendant argues that he was denied effective assistance of
counsel and a fair trial due to trial counsel's failure to object
to other instances where defendant's silence was used against him
at trial, and for not providing the defense expert with audio
recordings.  The People respond that any complaint with regard to
defendant's silence is unpreserved or was properly addressed by
the trial court, and that, regardless, any error would be
harmless.  Further, the People contend that defendant did receive
meaningful assistance of counsel.


                    A.   Defendant's Silence

        We agree with the Appellate Division that defendant's
challenges to the People's use of his silence are generally
unpreserved (117 AD3d at 1330; see also People v Alvarez, 20 NY3d
75, 81 [2012] ["errors of constitutional dimension...must be
preserved"]; People v McLean, 15 NY3d 117, 120-121 [2010]).
However, to the extent the challenge is preserved, we now turn to

whether the People violated defendant's constitutional rights.

Under both the Federal and New York State Constitutions a defendant has the right to remain silent at the time of defendant's arrest (N.Y. Const., art. I, § 6; U.S. Const. 5th Amend.; see also People v Basora, 75 NY2d 992, 992 [1990]). Therefore, a defendant's silence after arrest cannot be used by the People in their direct case (see e.g., Basora, 75 NY2d at 993; People v Conyers, 52 NY2d 454, 459 [1981]["Conyers II"]; People v Von Werne, 41 NY2d 584, 587 [1977]). The issue presented in this appeal is whether the People may use defendant's post-arrest silence to challenge defendant's credibility regarding possible fabrication of his EED defense. In Conyers II, this Court left open the question of whether evidence of silence for impeachment purposes violates the due process clause of our State Constitution (52 NY2d at 457; see also People v Williams, 25 NY3d 185, 194 [2015][court did not address whether the "People's use of [defendant's] selective silence also violated the State and Federal Constitution"]). We now conclude that use of defendant's silence for such purpose violates state due process guarantees.

This Court has previously, and repeatedly, "applied the State Constitution ... to define a broader scope of protection than that accorded by the Federal Constitution in cases concerning individual rights and liberties" (People v Baret, 23 NY3d 777, 804 [2014], quoting People v P.J. Video, 68 NY2d 296,

303 [1986], <u>cert denied sub nom.</u> <u>Baret v New York</u>, 135 S.Ct 961 [2015]; <u>see e.g.</u>, <u>People v Claudio</u>, 83 NY2d 76, 84 [1993]["the New York State right to counsel has always been deemed to be broader than its Federal counterpart"]; <u>Immuno AG. v Moor-Jankowski</u>, 77 NY2d 235, 249 [1991][the protection afforded by the guarantees of free press and speech in the New York Constitution is often broader than the minimum required by the Federal Constitution]; <u>Rivers v Katz</u>, 67 NY2d 485 [1986][right of involuntarily committed mental patients to refuse antipsychotic medication]; <u>People v Isaacson</u>, 44 NY2d 511 [1978] [due process limits on police conduct]). Thus, our analysis of defendant's claim is grounded in our recognition of the greater expanse of our State Constitution.

It is well established that this Court has never "adopt[ed] any rigid method of analysis which would, except in unusual circumstances, require us to interpret provisions of the State Constitution in 'Lockstep' with the Supreme Court's interpretations of similarly worded provisions of the Federal Constitution" (<u>People v Scott</u>, 79 NY2d 474, 490 [1992]). Instead, the test is "whether under established New York law and traditions some greater degree of protection must be given" (<u>id.</u> at 491). New York law has long maintained that evidence of silence at the time of a defendant's arrest may not be used against that person. In <u>People v Rutigliano</u> (261 NY 103, 107 [1933]), this Court explicitly held that a defendant is "under no

duty to speak and [defendant's] silence should not be counted as giving assent to what [defendant] hears. If [defendant] had counsel, [defendant] would doubtless be advised not to talk.  If [defendant] had not, [defendant] should not be prejudiced thereby."  Thus, well before the advent of Miranda, New York State recognized and protected a defendant's right to remain silent by limiting the use of that silence against him.

This Court has also recognized that Miranda warnings contain an implied promise that a defendant's silence will not be used against the defendant (Doyle v Ohio, 426 US 610, 619 [1976]).  In this Court's first Conyers decision, the Court held that protection of a defendant's right to remain silent was, in part, derived from the state constitutional privilege against self-incrimination, and the People could not use defendant's postarrest silence against the defendant, even absent Miranda warnings (People v Conyers, 49 NY2d 174, 179 [1980] ["Conyers I"], citing N.Y. Const. art. I, § 6], vacated sub nom. New York v Conyers, 449 US 809 [1980]; see People v Savage, 50 NY2d 673, 682 [1980][Cooke, J. concurring] [highlighting that Conyers I "was founded on the State's implied promise not to use against a defendant the constitutionally guaranteed right to remain silent"] [emphasis added]).  The Court explained that the right to remain silent was a "fundamental right" under our State Constitution, long protected and recognized under New York law (Conyers I, 49 NY2d at 180).

While the Supreme Court vacated and remanded Conyers I for further consideration in light of Jenkins v Anderson (447 US 231 [1980]), which upheld the use of pre-arrest silence for impeachment purposes under the United States Constitution, Jenkins, and the Supreme Court's remand of Conyers I, did not implicate our state constitutional due process rights analysis (see Conyers II, 52 NY2d at 453-454; see also Savage, 50 NY2d at 682). Rather, the Supreme Court specifically allowed State courts to develop evidentiary rules to address the probative and prejudicial aspects of the use of a defendant's silence. This Court then relied on state evidentiary rules in Conyers II, and again precluded use of the defendant's pretrial silence for impeachment purposes.

We, therefore, find the analysis of the state constitutional protections in Conyers I instructive, and continue to agree with the conclusion in Conyers I that "[h]aving made that promise, the State may not, consistent with any concept of fundamental fairness and due process, subsequently renege on that promise by utilizing [such] silence against [the defendant]" (49 NY2d at 179). As explained more fully in Conyers I, a defendant's fundamental right to remain silent is represented in the Due Process protection of the New York Constitution (N.Y. Const. art. I, § 6). This right, as explained above, has a long history in New York State, irrespective and independent of any Federal Constitutional protections such as Miranda (see Rutigliano, 261

NY at 107).

　　We also rely on concerns as identified in our prior analysis about the inherent unfairness attendant to the use of a defendant's pretrial silence, and the proper balance between the probative value of a defendant's silence and the potential risk of prejudice to the defendant inherent in the use of such evidence (see People v DeGeorge, 73 NY2d 614, 619 [1989]; Conyers II, 52 NY2d at 458; Conyers I, 49 NY2d at 181).  Those concerns are the same regardless of whether the People use defendant's silence as part of the case-in-chief or for impeachment purposes. As this Court has stated, the reasons for a defendant's silence when confronted by law enforcement are many, and include "awareness that [defendant] is under no obligation to speak or to the natural caution that arises from [the] knowledge that anything [said] might later be used against [defendant] at trial" (Conyers II, 52 NY2d at 458, citing Rutigliano, 261 NY at 107; accord United States v Hale, 422 US 171, 176-177 [1975]), and a belief that defendant's effort to exonerate oneself would be futile (Conyers II, 52 NY2d at 458, citing People v Dawson, 50 NY2d 311, 322 [1980]).  While a defendant's silence is ambiguous and lacks probative value, "[j]urors, who may not be sensitive to the wide variety of alternative explanations for a defendant's pretrial silence, may assign much more weight to it than is warranted and thus the evidence may create a substantial risk of prejudice" (DeGeorge, 73 NY2d at 619; see also Hale, 422 US at

180).

Here, because an EED defense has an objective element, there is even more cause for concern that the prejudice to defendant outweighs some measure of value to be gleaned from defendant's silence.  An EED defense requires proof "of a reasonable explanation or excuse for the emotional disturbance" based on events as "the defendant perceived them to be at the time" (People v Harris, 95 NY2d 316, 319 [2000]).  That defendant may have failed to inform the police that he was affected by EED is irrelevant to whether he was or was not suffering from EED at that time.  Defendant's assertions, or lack of assertions, of his emotional state, are not relevant in order to determine whether there was a reasonable explanation or excuse for his actions (DeGeorge, 73 NY2d at 620 [court barred use of defendant's pre-arrest silence due to the lack of probative value]).

The People respond that evidence of defendant's silence should be allowed to be used for impeachment in this case because defendant opened the door by testifying that he had a limited recollection of the murders.  According to the People, the prosecutor was entitled to ask questions to ascertain details concerning defendant's memory.  We agree as a general matter, but here defendant did not open the door but merely stated that his memory was affected by the trauma of the events and that with the passage of time he remembered some parts of the events.  That is not an example, as the People suggest, of defendant contradicting

a prior statement about what he remembered.  We are furthermore unpersuaded as to how the prosecutor's question, focused on what the defendant did not say to the police officers about the events, would further the People's alleged interest in eliciting the defendant's memory.

The People's argument in the alternative, that the prosecutor's question referred to defendant's conversation with police negotiator Detective Sergeant Ellis before defendant was arrested, and thus pre-Miranda, is presented for the first time on appeal, and therefore not properly before us (People v Samms, 95 NY2d 52, 55-56 [2000], citing CPL 470.05).  Even if preserved, the argument is meritless. Read in context, the prosecutor's question is properly understood to refer to defendant's statements made when he was in custody after his removal from the hotel, meaning after defendant was Mirandized.

Regardless, we reject the People's artificial distinction between defendants who are arrested and remain silent before Miranda warnings have been provided, and those who remain silent afterwards.  Indeed this Court has even held that pre-arrest silence cannot be used against a defendant in the People's case-in-chief (see DeGeorge, 73 NY2d at 620).  Once a defendant is arrested, the defendant is confronted by law enforcement and the reasons for the defendant's silence are no less ambiguous.  Thus, the concern associated with the lack of probative value and prejudice to the defendant applies with equal force once

defendant is arrested, even if there is a slight period of delay
before a defendant is Mirandized.  However, we consider the post-
arrest, pre-Miranda situation to be the rarest of events given
that Miranda warnings are customarily and by law provided upon
arrest.


## B.    Harmless Error

For the reasons we have discussed, the People's use of
defendant's silence constituted a violation of his state
constitutional rights, and as such he is entitled to a new trial
unless "there is no reasonable possibility that the error might
have contributed to defendant's conviction and that it was thus
harmless beyond a reasonable doubt" (People v Crimmins, 36 NY2d
230, 237 [1975]).  Here, because defendant admitted his guilt but
sought to mitigate the penalty based on an EED defense, the
question is whether there was overwhelming evidence that
defendant failed to establish that defense (People v Best, 19
NY3d 739, 744 [2012]["A constitutional error may be harmless
where evidence of guilt is overwhelming and there is no
reasonable possibility that it affected the outcome of the
trial"]).

Under our law, EED is an affirmative defense that reduces
defendant's criminal culpability from murder to first degree
manslaughter (Harris, 95 NY2d at 318-319; Penal Law §§ 125.25,
125.20 [2]).  It does not negate intent, but instead allows the

trier of fact to afford lenience to an emotionally disturbed

defendant who is "deserving of mercy" (People v Casassa, 49 NY2d

668, 680-681 [1980], cert denied 449 US 842 [1980]).

A defendant must prove the EED defense by a preponderance of

the evidence (Harris, 95 NY2d at 319, citing People v Moye, 66

NY2d 887, 889 [1985]; People v Diaz, 15 NY3d 40, 45 [2010]).  As

this Court explained in Harris, evidence against an EED defense

> "requires proof of both subjective and objective
> elements.  The subjective element focuses on the
> defendant's state of mind at the time of the crime and
> requires sufficient evidence that defendant's conduct
> was actually influenced by an extreme emotional
> disturbance.  This element is generally associated with
> a loss of self-control.  The objective element requires
> proof of a reasonable explanation or excuse for the
> emotional disturbance . . .  by viewing the subjective
> mental condition of the defendant and the external
> circumstances as the defendant perceived them to be at
> the time, however inaccurate that perception may have
> been, and assessing from that standpoint whether the
> explanation or excuse for [the] emotional disturbance
> was reasonable"

(95 NY2d at 319 [internal citations omitted]).

The EED defense is broader than the former "heat of passion"

doctrine (Casassa, 49 NY2d at 675-676).  An EED defense does not

require that a defendant establish spontaneous conduct, or an

immediate reaction to some provocation (id. at 676).  The

"significant mental trauma" may very well have "affected

defendant's mind for a substantial period of time, simmering in

the unknowing subconscious and then inexplicably coming to the

fore" (id.).

Here, defendant stalked Howard and Carter.  It is undisputed that his acts, including multiple phone messages where he declared his love for Howard, referred to her birthday, and discussed their time together, were calculated to manipulate her and to prey on her emotions. Furthermore, defendant knowingly placed himself in a position where, while armed, and, according to his own testimony, suffering from depression as well as feeling physically and mentally exhausted, sought out Howard and her new lover.  He made a choice to find them, using the internet to locate Carter's address, and once there, going so far as to lie to strangers in an effort to locate Carter's apartment.  In addition, multiple witnesses described defendant as calm and composed in the hours and minutes before the shootings.

When Howard answered Carter's door, she was dressed only in a bathrobe.  Defendant testified that this put to rest any previous doubts about the nature of her relationship with Carter. According to his own account, defendant then drove away, but made a conscious decision to return.  These are not the actions of someone who finds himself without time to think or deliberate (see People v Roldan, 222 AD2d 132 [1st Dept 1996]). Rather, overwhelming evidence exists that defendant made choices--albeit bad ones, but choices nonetheless.  As the People's expert explained, defendant's ability to act rationally, especially by calmly speaking to Carter's neighbors to discern Carter's

apartment and then leaving and returning to the apartment once he realized that Howard was romantically involved with Carter, significantly undercut defendant's EED defense, and to the mind of the expert, established that defendant was not affected by EED when he killed Howard and Carter.

Evidence existed that defendant shot both victims twice, the second shot fired at each from an overhead position, while the victim was on the ground. In addition, the evidence demonstrated that defendant stepped on Howard's back after the shooting. Furthermore, five of the casings were found on a coffee table, and defendant wiped his hands afterwards on a towel. This is evidence of an intentional actor, not one who has suffered a break from reality. Moreover, while EED must be determined based on the moments before and during the murder, that defendant fled and had the presence of mind to obtain survival supplies is evidence of planned, rather than spontaneous, murders.

That defendant's expert opined defendant suffered from EED at the time of the shootings does not negate the overwhelming proof that defendant failed to establish his EED defense by a preponderance of the evidence. The evidence unquestionably demonstrated that the People's expert had a greater familiarity with EED and was better prepared. Defendant's expert had only testified one other time regarding EED, as opposed to the People's expert who had testified dozens of the times about this issue. Further, the People's expert had written articles on the

subject of EED, articles which defendant's expert admitted he had read for background.  In addition, only the People's expert listened to the recordings, and he testified that hearing the tone of defendant's voice helped shape his understanding of defendant's mental state and whether defendant suffered from an emotional condition consistent with EED when he killed the victims.  Thus, the People's expert contradicted the evidentiary basis for the opinion of defendant's expert, undermining the defendant's expert, and provided additional evidence against defendant's defense of EED.

Furthermore, there is no reasonable possibility that the inclusion of testimony about defendant's silence "contributed to defendant's conviction" (Crimmins, 36 NY2d at 218).  There were two other instances of similar testimony admitted at trial. Thus, information about defendant's post-arrest silence, and the implication by the People that defendant fabricated the EED defense, were before the jury.  In light of the evidence presented against defendant there is no indication, nor any reason for us to conclude, that defendant's testimony as to his silence had any effect on the verdict.  On this record the credentials and testimony of the dueling experts was far more relevant to the jury, including that the People's expert had greater experience and knowledge of EED, and had concluded that defendant's actions were those of a stalker.

Unlike our dissenting colleague (dissenting op, at 1), we

are unable to say that under these facts the violation of defendant's constitutional right to remain silent requires a new trial.  There was overwhelming proof and of no reasonable possibility that defendant did not suffer under an extreme emotional disturbance (see People v Maher, 89 NY2d 456, 462-463 [1997][defendant's "emotional disturbance [as] a thwarted lover" did not indicate he suffered from EED when his actions could have been construed as a "plan," which included a pattern of escalating threats, and did not appear "reasonable"]).  Therefore the constitutional violation of defendant's right to remain silent was harmless error.

## C.   Ineffective Assistance of Counsel

Defendant's other claim, that his counsel failed to represent him in accordance with both the federal and state constitutional standards for effective assistance, is without merit.  This claim concerns defense counsel's failure to object to references to defendant's silence during the testimony and prosecutor's summation, and the failure of counsel to provide the audio recordings to defendant's expert witness for trial preparation.  We conclude, based on the facts of this case, that defense counsel's failures do not constitute ineffective representation.

In determining whether counsel provided effective assistance, "[t]he core of the inquiry is whether defendant

received meaningful representation" (People v Benevento, 91 NY2d 708, 712 [1998]). In making that assessment, the Court must view counsel's performance in its totality (see People v Baldi, 54 NY2d 137, 147 [1981]). Defendant, of course, bears the burden of establishing his claim that counsel's performance is constitutionally deficient (People v Barboni, 21 NY3d 393, 406 [2013]). Thus, defendant must demonstrate the absence of strategic or other legitimate explanations for counsel's alleged failure (People v Satterfield, 66 NY2d 796, 799-800 [1985]). However, a reviewing court must be careful not to "second-guess" counsel, or assess counsel's performance "with the clarity of hindsight," effectively substituting its own judgment of the best approach to a given case (Benevento, 91 NY2d at 712). The test is "reasonable competence, not perfect representation"(People v Modica, 64 NY2d 828, 829 [1985] [internal quotation marks omitted]).

For the reasons we have discussed, counsel was not ineffective for failing to object, given that the evidence was overwhelming that defendant did not labor under EED at the time of the murders. Moreover, the testimony of the officers in part supported defendant's EED defense because they testified that defendant discussed his suicidal intentions after the killings. We cannot say on this record that defense counsel lacked a strategic reason for permitting the testimony without objection (Satterfield, 66 NY2d at 799-800 ["It is not for this court to

second-guess whether a course chosen by defendant's counsel was the best trial strategy, or even a good one, so long as defendant was afforded meaningful representation"]).

Likewise, defense counsel's failure to provide the audio recordings to their expert did not render counsel's representation of defendant ineffective. This is not the case where counsel wholly fails to provide an expert without any basis upon which to develop an opinion, or provides an expert with incorrect information. Rather, defense counsel provided the expert with information about defendant's statements through the transcripts, and then made a strategic choice to proceed with his expert's favorable opinion based on those transcripts. On this record, without more to suggest defense counsel's decision is irreconcilable with the medical testimony as he understood it at the time of the trial, we cannot say that defense counsel's strategy renders his representation ineffective.

Defendant failed to sustain his burden to establish that his attorney "failed to provide meaningful representation" that compromised "his right to a fair trial" (People v Caban, 5 NY3d 143, 152 [2005]). Since "our state standard ... offers greater protection than the federal test, we necessarily reject defendant's federal constitutional challenge by determining that he was not denied meaningful representation under the State Constitution" (id. at 156). We therefore reject his ineffective assistance of counsel claim.

III.

For the reasons discussed in this opinion the Appellate Division order should be affirmed.

People v Anthony V. Pavone

No. 199

STEIN, J.(concurring):

I agree with the plurality's conclusion that defendant received the effective assistance of counsel at trial. However, with respect to the issue of whether defendant's right to remain silent was violated, I respectfully concur in result only. In my view, defendant failed to preserve any of his challenges to the People's use of his silence (see People v Williams, 25 NY3d 185, 190 [2015]). Therefore, we cannot consider whether there was error and, if so, whether the error was harmless.

People v Anthony V. Pavone

No. 199

PIGOTT, J.(dissenting):

I dissent for reasons stated in the dissenting opinion

of Justice Garry at the Appellate Division.

*    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *    *

Order affirmed.  Opinion by Judge Rivera.  Chief Judge Lippman
and Judge Fahey concur.  Judge Stein concurs in result in an
opinion in which Judge Abdus-Salaam concurs.  Judge Pigott
dissents in an opinion.

Decided December 17, 2015

- 1 -