People v Reese (2018 NY Slip Op 07365)





People v Reese


2018 NY Slip Op 07365


Decided on November 1, 2018


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: November 1, 2018

107886

[*1]THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v
DAVID REESE, Appellant.

Calendar Date: September 7, 2018

Before: Garry, P.J., McCarthy, Egan Jr., Lynch and Devine, JJ.


Arthur G. Dunn, Troy, for appellant, and appellant pro se.
D. Holley Carnright, District Attorney, Kingston (Hannah E.C. Moore, New York Prosecutors Training Institute, Inc., Albany, of counsel), for respondent.



MEMORANDUM AND ORDER
Egan Jr., J.
Appeal from a judgment of the County Court of Ulster County (Williams, J.), rendered August 13, 2015, upon a verdict convicting defendant of the crime of murder in the second degree.
On the morning of February 3, 2014, defendant, a stationary engineer employed by the New York City Department of Environmental Protection (hereinafter DEP) in its maintenance shop in the City of Kingston, Ulster County, walked to the office of a DEP police officer with a pistol in his back pocket. After the officer relieved defendant of the pistol and asked him what was going on, defendant announced that he had shot a coworker. Defendant was arrested and the body of the coworker, Aron Thomas (hereinafter the victim), was found in another part of the building, lying on the floor in a pool of blood. Defendant was subsequently charged by indictment with murder in the second degree and, following a jury trial — wherein defendant raised the affirmative defenses of extreme emotional disturbance (hereinafter EED) and not guilty by reason of mental disease or defect — he was convicted as charged. County Court thereafter sentenced defendant to a prison term of 25 years to life. Defendant now appeals, and we affirm.
Defendant contends that the jury's verdict was not supported by legally sufficient evidence because the proof elicited at trial failed to establish that he had the requisite intent to cause the death of another person and, instead, the victim's death was the result of an accident. Alternatively, defendant contends that the jury's rejection of the affirmative defenses of EED and not guilty by reason of mental disease or defect was against the weight of the evidence. In assessing a challenge to the legal sufficiency of the evidence, "this Court views the evidence in the light most favorable to the People to evaluate whether any valid line of reasoning and permissible inferences could satisfy every element of the charged crime[] and lead rational people to the conclusion reached by the jury" (People v Pratt, 162 AD3d 1202, 1202 [2018], lv denied 32 NY3d 940 [2018]; see People v Robinson, 156 AD3d 1123, 1124 [2017], lv denied 30 [*2]NY3d 1119 [2018]). In assessing the weight of the evidence, "[w]here, as here, a different verdict would not have been unreasonable, we must . . . weigh conflicting testimony, review any rational inferences that may be drawn from the evidence and evaluate the strength of such conclusions" (People v Benson, 119 AD3d 1145, 1146 [2014] [internal quotation marks and citation omitted], lv denied 24 NY3d 1118 [2015]; see People v Williams, 130 AD3d 1323, 1324 [2015]; People v Chancey, 127 AD3d 1409, 1410 [2015], lv denied 25 NY3d 1199 [2015]). As relevant here, a person is guilty of murder in the second degree when, "[w]ith intent to cause the death of another person, he [or she] causes the death of such person" (Penal Law § 125.25 [1]). To that end, it is well settled that "[t]he intent to kill may be inferred from the surrounding circumstances and a defendant's actions" (People v Croley, 163 AD3d 1056, 1056 [2018] [internal quotation marks and citation omitted]; see People v Hamilton, 127 AD3d 1243, 1245 [2015], lv denied 25 NY3d 1164 [2015]).
Defendant testified at trial, and he does not deny that he caused the death of the victim; rather, he claims that the shooting was an accident that occurred during "a struggle for self-preservation" such that the People failed to establish the requisite intent to kill. According to defendant, he believed that the victim burglarized his home in 2011 and had been surreptitiously surveilling him and his family since that time, and that he randomly chose the morning of the shooting to confront the victim about these events. He testified that, while walking into the maintenance office that morning, the victim had cut defendant off, rolled his eyes at defendant, slammed a few doors in the maintenance shop and then walked into their shared office space and slammed a clipboard on a cabinet before walking back out into the maintenance shop. Defendant testified that, based on the victim's conduct, it "seemed like he wanted my attention for some reason." Defendant then walked over to where the victim was standing and asked, "why are you stalking me and my family," to which the victim replied, "wasn't me, wasn't me." Defendant then repeated the question, while pulling out a pistol from underneath his jacket and holding it next to his right thigh. Defendant claims that an altercation subsequently ensued when the victim attempted to grab the pistol from him and that, in the resulting struggle, defendant punched the victim in the face with his left hand and, as defendant did so, the pistol in his right hand simultaneously discharged. According to defendant, this shot did not strike the victim and, at that point, the victim was kneeling on the ground facing away from defendant. Defendant testified that he then put his hand on the victim's shoulder and continued yelling at him stating, "why did you break into my house, why are you stalking me and my family, why are you f***ing with me and my family?" Defendant claims that the victim then lunged at him a second time in an attempt to get his pistol, causing defendant to fall backwards onto the floor and his pistol to accidentally discharge a second time, killing the victim.
The People, however, offered evidence of defendant's conduct both before and after the shooting that they claim clearly established defendant's intent to kill. The People submitted proof that defendant and the victim were not friendly with one another and generally did not speak to each other based upon a long-simmering tension that had developed as a result of, among other things, defendant's belief that the victim was racist and had previously burglarized his home and was stalking/ surveilling him and his family. On the Friday before the shooting, defendant went to a sporting goods store and purchased ammunition for his pistol. The following Monday morning, defendant arrived at work with the loaded pistol and, less than 20 minutes later, confronted the victim at gunpoint. Contrary to defendant's version of events, photographs of the maintenance shop where the alleged altercation and shooting took place provided no indication that any struggle had occurred. Moreover, the medical examiner who performed an autopsy of the victim testified that the victim had suffered a blunt force injury to the head, not from a punch, but more consistent with having been hit with a gun. Gunshot residue tests, meanwhile, indicated that defendant was approximately two to three feet away from the victim when the fatal shot occurred and, based on the medical examiner's observation of the entrance wound, he opined that the victim was facing away from defendant when he was shot and killed. A forensic scientist and firearms examiner who examined defendant's pistol found that it was in working order and its safety devices were functional, including the "drop safety," which prevents the pistol from accidentally going off when dropped. She further opined that the pistol would not have gone off [*3]by itself without pressure being applied to the trigger [FN1]. Following the shooting, defendant called 911 to report it and then walked to the DEP officer's office with his pistol; in each instance, defendant reported that he shot the victim, but he did not claim it to be an accident. Viewing the evidence in a light most favorable to the People, we find that a valid line of reasoning and permissible inferences exist from which the jury could conclude that defendant possessed the requisite intent to shoot and kill the victim (see People v Mathews, 134 AD3d 1248, 1249 [2015]).
We also find unavailing defendant's contention that the jury's rejection of the affirmative defenses of EED and not guilty by reason of mental disease or defect were against the weight of the evidence. "To establish an [EED] defense, a defendant must show by a preponderance of the evidence 'first, that he or she acted under the influence of an [EED] and, second, that there was a reasonable explanation or excuse for that disturbance'" (People v Williams, 130 AD3d at 1324, quoting People v Roche, 98 NY2d 70, 75 [2002]). With regard to the first element, defendant was required to show that he "was subjectively under an [EED], which usually involves a loss of self-control" (People v Williams, 130 AD3d at 1324; see People v Cass, 18 NY3d 553, 561 [2012]; People v Pavone, 117 AD3d 1329, 1331-1332 [2014], affd 26 NY3d 629 [2015]). When presented with competing expert testimony with respect to a defendant's state of mind at the time he or she committed the alleged criminal activity, it is within the jury's province to credit the testimony of one expert over another and reject the affirmative defenses of EED or not guilty by reason of mental disease or defect (see People v Hadfield, 119 AD3d 1217, 1222 [2014], lv denied 25 NY3d 989 [2015]; People v Benson, 119 AD3d at 1148).
Defendant presented the testimony of a forensic psychiatrist who opined that defendant has been suffering from a delusional disorder since 2011 and, as a result thereof, did "not fully understand the wrongfulness of what he was doing when he committed the instant offense." The People, however, provided counter testimony from their own forensic psychiatrist who opined that "defendant did not lack substantial capacity to know or appreciate the nature and consequences of his actions" and did not suffer from an EED at the time that he shot the victim. Significantly, these competing expert opinions were not the only proof offered at trial as to whether defendant suffered from an EED when he shot the victim. Extensive additional proof was submitted regarding defendant's conduct both before and after the shooting that undermined his claimed EED and mental disease and defect defenses. As previously noted, defendant harbored animosity toward the victim, had purchased ammunition for his pistol the Friday before the shooting and, less than 20 minutes after he arrived at work the following Monday morning, he used same to kill the victim. Further, despite the victim's claimed aggressive behavior that morning (i.e., slamming doors and clip boards), defendant testified that no words were exchanged between the two and that he remained calmly at his desk for some time before choosing to confront the victim. Defendant testified that, when he did ultimately confront the victim, he did so in order to let the victim know that, "if [the victim didn't] stop stalking [him] and [his] family, that [the victim was] going [to] have consequences."
Following the shooting, defendant calmly called 911, reported the shooting and followed the dispatcher's instructions. He then knocked on the office door of the DEP police officer located within the same building and allowed the officer to remove his pistol from his back pocket. Defendant then proceeded to walk out of the building alongside the DEP officer, whereupon he coolly indicated to the officer that he had shot the victim and then allowed himself to be taken into custody without incident. A City of Kingston police officer who subsequently interviewed defendant at the police station testified that, during the interview, defendant was calm, quiet and respectful and answered the questions that were asked of him. Based on the foregoing proof, we find that a rational jury could have reasonably determined that defendant's conduct, both before and after the shooting, evidenced a calm and calculated deliberateness [*4]demonstrating that he had full command of his faculties and exhibited a consciousness of guilt that was wholly inconsistent with an EED defense (see People v Williams, 130 AD3d at 1324-1325; People v Pavone, 117 AD3d at 1335-1336). Accordingly, weighing the conflicting testimony and the strength of conflicting inferences to be drawn from the evidence, and giving deference to the jury's factual and credibility determinations, we find that defendant failed to prove his affirmative defenses by a preponderance of the evidence and, therefore, we find no reason to disturb the jury's determinations in this regard (see People v Williams, 130 AD3d at 1325-1326; People v Chancey, 127 AD3d at 1411; People v Benson, 119 AD3d at 1148; see also People v Bleakley, 69 NY2d 490, 495 [1987]).
Next, defendant failed to preserve his contention that County Court committed reversible error by failing to sua sponte provide a justification defense in its charge to the jury as no request was made for such a charge, nor was any objection rendered following County Court's final charge to the jury (see People v Marshall, 162 AD3d 1110, 1115 [2018], lv denied 31 NY3d 1150 [2018]; People v Ramirez, 118 AD3d 1108, 1111 [2014]). In any event, a justification charge would have been totally incompatible with the primary defenses that he offered at trial — i.e., that this was an intentional act committed by a person suffering from an EED or mental disease or defect or that this was an accidental shooting (see People v Howard, 22 NY3d 388, 401 [2013]; People v DeGina, 72 NY2d 768, 777 [1988]; see also People v Clark, 129 AD3d 1, 4 [2015], affd 28 NY3d 556 [2016]). Likewise, defendant's trial counsel cannot now be found to be ineffective for failing to request such a charge and interject yet another defense theory of the case that would only have served to confuse the jury and undermine defendant's credibility (see People v McFadden, 161 AD3d 1570, 1572 [2018], lv denied 31 NY2d 1150 [2018]; People v Nauheimer, 142 AD3d 760, 761 [2016], lv denied 28 NY3d 1074 [2016]).
Lastly, although defendant had no prior criminal history, given the violent and senseless nature of this crime and his lack of remorse for having unjustifiably shot and killed his coworker — a 33-year-old husband and father with two young children — we reject the claim that County Court's imposition of the maximum sentence constituted an abuse of discretion and find no extraordinary circumstances that would warrant our modification of defendant's sentence in the interest of justice (see People v Cayea, 163 AD3d 1279, 1283 [2018]; People v Criss, 151 AD3d 1275, 1281 [2017], lv denied 30 NY3d 979 [2017]). Defendant's remaining contentions, to the extent not specifically addressed, have been reviewed and found to be without merit.
Garry, P.J., McCarthy, Lynch and Devine, JJ., concur.
ORDERED that the judgment is affirmed.



Footnotes

Footnote 1: Moreover, defendant acknowledged that he had received firearms training while in the Navy and had subsequently taken a firearms safety course prior to purchasing his pistol. As such, he was familiar with how to safely handle a firearm, including the safety devices affiliated therewith.